## STATE OF HAWAII *v.*
## WILLIAM ROLLIN GOUDY II.

### No. 4933.

JANUARY 13, 1971.

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by defendant William Rollin Goudy II from a circuit court judgment convicting him of possession of firearms by a person convicted of a crime of violence, in violation of HRS § 134-7(b). Defendant had previously been convicted of burglary, which, under the definition in HRS § 134-1, is a crime of violence.

The sole issue on appeal is whether the circuit court properly denied the defense motion for suppression of

evidence. The items of evidence sought to be suppressed were one .22 caliber Marlin rifle, one 9 mm. Luger pistol, and one .32 caliber Walther pistol. The police obtained these items under the circumstances described below.

At 10 o'clock in the morning of June 23, 1969, Sergeant Carl Ledward of the Honolulu police department received an anonymous telephone call at the Kaneohe police station informing him that within an hour there would be a transaction in guns, diamond ring, and diamond watch, which the informant thought was illegal; that the transaction would take place at 127 Oneawa Street, Kailua; that the buyer would be driving a black Barracuda automobile; and that the passenger in the automobile would be the contact man to obtain the articles.

Upon receiving the telephone call, Ledward went to Kailua to check the address, but there was no house on Oneawa Street with the given number. However, together with Detective Donald Kamakea, whom he met at the Kailua police station, he kept a watch for an automobile fitting the informant's description at Andy's Drive-Inn on Oneawa Street.

At 11:10 o'clock, Ledward and Kamakea saw a black Barracuda, with driver and a passenger, proceed on Oneawa Street in the Kaneohe direction. The driver was later identified as James Kaaku. Defendant was the passenger.

Ledward and Kamakea followed the Barracuda in Kamakea's automobile, with Kamakea driving. Kamakea's automobile was used because it had no police insignia.

The Barracuda stopped in front of a house at 728 Oneawa Street. Kamakea drove past the Barracuda for about a block to the intersection of Oneawa Street and Oneawa Place, where he turned his automobile around and backed into Oneawa Place.

Ledward and Kamakea set up a surveillance of the Barracuda behind a growth of pine trees at the intersection.

Ledward watched with his naked eyes. Kamakea used binoculars in making his observation.

On the surveillance, both Ledward and Kamakea saw defendant make the following movements: He got off the Barracuda, entered a nearby lane, and returned within a few minutes with a beige-colored case which appeared to contain a rifle. He placed the case in the back of the automobile, then went into the house at 728 Oneawa Street, returned with a brown paper sack, and got back into the automobile.

When defendant got back into the Barracuda, Kaaku turned the automobile around, and drove it back in the direction of Kailua town at a speed of about 20 miles, well within the legal speed limit.

Ledward and Kamakea again followed the Barracuda. Just before reaching the intersection of Oneawa Street with Kailua Road, Kamakea tooted his horn, and Ledward motioned to Kaaku to pull over. Instead of pulling over, Kaaku made an abrupt stop. The stop took place in front of the City Bank Building at 43 Oneawa Street. Ledward and Kamakea decided to stop the Barracuda at that location lest there might be a getaway if it was permitted to go beyond the intersection.

Up to this point, there was nothing furtive in the actions of Kaaku and defendant, and nothing to arouse any suspicion of criminal activity, except for substantial dovetailing of police observations with the information given in the anonymous telephone call. Neither Ledward nor Kamakea knew defendant. Ledward did not know Kaaku. Kamakea knew Kaaku as a musician, had heard that he was "a member of the criminal world," but was not sure that he was.

When the Barracuda stopped, Ledward and Kamakea approached it from different sides with drawn pistols. Ledward approached Kaaku from the left side of that auto-

mobile, and told him to get out. Kaaku did so with his hands up. Kamakea approached defendant from the right side, and opened the door to have him come out.

While making the approaches, both Ledward and Kamakea saw the butt end of a rifle sticking out from a case on the back seat of the Barracuda. In addition, when he opened the door to have defendant come out, Kamakea noticed the butt end of a pistol exposed from a package on the floor.

Upon seeing the rifle and the pistol in the Barracuda, Kamakea placed Kaaku and defendant under arrest for being offensively armed, and took them to the Kailua police station for booking.[1] Defendant was formally charged on the day after the arrest with violation of HRS § 134-7(b), instead of for being offensively armed, which is a violation of HRS § 727-25.[2]

The rifle Ledward and Kamakea saw on the back seat of the Barracuda was the .22 caliber Marlin rifle. The pistol Kamakea noticed on the floor was the 9 mm. Luger pistol. After the arrest, Kamakea found the .32 caliber Walther pistol between the bucket seats of the automobile. That pistol was fully loaded with one round in the chamber, and cocked.

In deciding the issue raised on this appeal, we must

---

[1] Kamakea testified as follows regarding the arrest he made: "When I approached the car I noticed the butt end of the rifle sticking out of the case which was on the back seat. I also noticed a package on the floor with some papers in it and the butt end of a pistol sticking out. I then placed both occupants of the car under arrest."

[2] HRS § 727-25 reads as follows: "§ 727-25. Carrying deadly weapons; penalty. Any person not authorized by law, who carries concealed upon his person or within any vehicle used or occupied by him, or who is found armed with any dirk, dagger, blackjack, slug shot, billy, metal knuckles. pistol, or other deadly or dangerous weapon, shall be fined not more than $250, or imprisoned not more than one year, or both. Any such person may be immediately arrested without warrant by any sheriff, policeman, or other officer or person. Any weapon, above enumerated, shall, upon conviction of the one carrying or possessing same under this section, be summarily destroyed by the chief of police or sheriff."

first inquire whether the stopping of the Barracuda by Ledward and Kamakea was a constitutionally permissible action.

On this point, *Terry* v. *Ohio*, 392 U.S. 1 (1968), is apposite. That was a stop and frisk case. The case at hand involved stop only, and not a frisk. But the discussion there of considerations involved in constitutionally permissible street stops is pertinent.

*Terry* states that a police officer may "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"; that this is warranted by the general governmental interest in effective crime prevention and detection; and that, given a state of facts, which separately may appear innocent but which taken together would warrant investigation, it would be poor police work to fail to make further investigation. However, it cautions that such an intrusion upon personal liberty must be reasonable and be based on something more substantial than inarticulate hunches, and that reasonableness is to be judged by an objective standard, namely, whether the facts known by the officer would warrant a man of reasonable caution to believe that the action taken was appropriate.

Here, circumstances were appropriate for Ledward and Kamakea to approach Kaaku and defendant to question them about possible criminal conduct.

The anonymous telephone call to Ledward did not justify arrest or search. But the call was a factor in the totality of circumstances which made the decision of Ledward and Kamakea to stop the Barracuda and approach its occupants for questioning reasonable.

Where, as here, the telephone call related to possible traffic in firearms, it would have been poor police work on the part of Ledward not to have followed up the given

information. Dealings in firearms, and possession thereof, are very strictly regulated in HRS c. 134.

Also, it would have been poor police work on the part of Ledward and Kamakea not to have stopped the Barracuda and questioned its occupants when, upon surveillance, they observed facts which substantially corroborated the information in the telephone call. The observed facts might have been consistent with lawful activity. But they were also consistent with possible criminal activity.

Under such circumstances, a stop for brief inquiry, without more, does not constitute an arrest. It is stated in *Wilson* v. *Porter*, 361 F.2d 412, 415 (9th Cir. 1966) :

"We take it as settled that there is nothing ipso facto unconstitutional in the brief detention of citizens under circumstances not justifying an arrest, for purposes of limited inquiry in the course of routine police investigations. * * * A line between reasonable detention for routine investigation and detention which could be characterized as capricious and arbitrary cannot neatly be drawn. But due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing."

Also, under similar circumstances, the mere approach with drawn pistols upon persons stopped for questioning is not an arrest. In *Wartson* v. *United States*, 400 F.2d 25, 28 (9th Cir. 1968), the court stated, citing *Terry:*

"Appellant further argues that the arrest was made in the bathroom when Officer Smith pulled his gun. At that time, according to appellant, Officer Smith

only knew that a person fitting appellant's general description had robbed a bank and had come to the general area. Appellant contends that he was actually restrained in the bathroom, and thus was arrested there. Nevertheless, we agree with appellee that appellant was only briefly detained in the bathroom and was not arrested until he was handcuffed outside the house. Such brief, informal detentions for a limited inquiry are not arrests and the peace officer need not possess the probable cause necessary to make an arrest."

There is a cautionary statement in *Terry* that an investigative action which is reasonable at its inception may violate the constitutional protection against unreasonable searches and seizures by virtue of its intolerable intensity and scope. In this connection, questions may possibly be raised as to the reasonableness of the actions of Ledward and Kamakea, first, in ordering Kaaku and defendant out of the Barracuda instead of questioning them while they were seated in the automobile, and, second, in approaching them with drawn pistols.

On the first point, *Carpenter* v. *Sigler*, 419 F.2d 169 (8th Cir. 1970), supports the actions of Ledward and Kamakea. In that case, two police officers stopped a suspicious automobile after a period of surveillance. After holding that the stop was reasonable under *Terry*, the court considered the question as to whether under the *Terry* analysis, "the scope of the 'seizure' was reasonably related to the circumstances which justified the interference in the first place." The court stated:

"The problem of the scope of the intrusion focuses the analysis on the request by officer Cowan for Hawkins to get out of the car. Officer Cowan testified that he requested Hawkins to get out of the car so he could identify him. This, of course, could have been done by the officer requesting Hawkins to hand him his iden-

tification through the window. This would seem to indicate that the officer went beyond the scope of the original intrusion. However, when the request for identification is considered with the unusual circumstances justifying the stop plus the darkness and the possibility that Hawkins was holding a gun inside the car beyond the sight of officer Cowan, the request to get out of the car seems reasonable in light of the circumstances."

The stop in this case was made in broad daylight, instead of in darkness as in *Carpenter*. Nevertheless, we think that the ordering out was justified by the same circumstances which made the stop reasonable.

On the second point also, we think that the same circumstances support the actions taken by Ledward and Kamakea as reasonable self-protective measures. It is stated in *Terry*:

"Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."

The stop of the Barracuda being reasonable, and the subsequent actions of Ledward and Kamakea in approaching Kaaku and defendant with drawn pistols and ordering them out of the automobile not being an arrest, *State* v. *Hanawahine*, 50 Haw. 461, 443 P.2d 149 (1968), applies.

We need not decide whether the sighting of the butt end of the Marlin rifle in the back seat of the Barracuda by Ledward and Kamakea while they were approaching Kaaku and defendant provided probable cause for their arrest. When the door of the Barracuda was opened to let defendant out and the butt end of the Luger pistol was seen in open view on the floor, that certainly provided sufficient probable cause for arrest under HRS § 727-25.

The fact that Kamakea opened the door does not matter. He opened the door not to pry into the automobile but to let defendant out. Kamakea arrested Kaaku and defendant only after he saw the butt end of the Luger pistol. Kamakea later found the Walther pistol between the bucket seats of the Barracuda. That discovery was made upon a search incident to lawful arrest.

Affirmed.

*Thomas P. Huber* (*Cades Schutte Fleming & Wright* of counsel) for appellant.

*Douglas L. Halsted,* Deputy Prosecuting Attorney (*Barry Chung,* Prosecuting Attorney, with him on the brief) for appellee.

---

DISSENTING OPINION OF ABE, J.

It appears that the decision of the majority of this court concedes that the officers did not have probable cause to effectuate an arrest at the time they stopped the automobile. I agree. But this court then holds that the officers did not arrest the defendant but, in accordance with the rule of *Terry* v. *Ohio,* 392 U.S. 1 (1968), only stopped and detained him for investigatory purposes. I do not agree because the record indicates the officers stopped the automobile to arrest the defendant, not to investigate.

## I.

WAS DEFENDANT ARRESTED WITHOUT PROB-ABLE CAUSE?

Officer Ledward testified as follows:

"I pulled the car over and I asked the driver to stop, and I came right out. As I got up to the car I did see the rifle on the back seat of the car.

"Q (By Mr. Campbell) Was any part of the weapon exposed when you walked up to the car?"

"A The butt part of the rifle was sticking out of this leather or the OD case.

"Q Did you see anything else in the car?

"A That I wasn't able to see. I saw that and I was putting my attention on both parties.

\*       \*       \*       \*       \*

"Q What happened after that?

"A Well—I went on the left side, the driver's side—

"Q What did you observe?

"A —and Detective Kamakea went on the right side, and there was Officer DeCosta who pulled up when we told him we were going to stop this car. Right there we ordered the two out and they were placed under arrest by Detective Kamakea for possession firearms."

Further, Officer Ledward on cross examination stated:

"Q You mean you had come out Oneawa and driven up Kailua Road?

"A No, we hadn't touched Kailua. This is all on Oneawa. Detective Kamakea and I decided that we would stop them in that general area. In the event that we did, should they try to abandon and flee on foot, we would be able to catch. In the open area, why, they could go most any direction.

"Q  Directing your attention at the arrest, how did you actually make the arrest?

"A  I came out, like I said, from the passenger side of Detective Kamakea's car, and I approached the driver. First, I told him to stop and he came to an abrupt stop. So I got out there and Detective Kamakea got out, and I went out to the driver's side and he went around to the passenger side.

\*　　　\*　　　\*　　　\*　　　\*

"Q  Did you have your guns drawn when you pulled them over to the side?

"A  Yes, sir, as I got off the car I had my gun drawn and I think Detective Kamakea had his—

"Q  Were there other police there as well?

"A  Yes, there was another uniformed officer. That was Officer Melvin DeCosta who pulled up right in back of the car in which Mr. Goudy was riding in.

\*　　　\*　　　\*　　　\*　　　\*

"Q  Prior to the arrest you said you pulled up alongside, you stopped the automobile, you ordered them out of the car and you placed them under arrest immediately?

"A  Yes, sir. Yes, sir. Like I said, Detective Kamakea placed both of the occupants under arrest."

The other officer, Detective Kamakea testified as follows:

"A couple of minutes later I saw this same person come back to the car carrying a rifle case in his right hand. I then observed him place the rifle in the back seat of the car and went back into this lane or driveway. And then a few minutes later he came with a brown paper bag under his arm, got in the car, conversed with the driver for a little while.

"Then the car started out, drove into another lane where they backed up and continued back on Oneawa Street in the Waimanalo direction, and Sgt. Ledward

and I pulled them over fronting 43 Oneawa Street.

"When I approached the car I noticed the butt end of the rifle sticking out of the case which was on the back seat. I also noticed a package on the floor with some papers in it and the butt end of a pistol sticking out. I then placed both occupants of the car under arrest.

    \*       \*       \*       \*       \*

"Q    Will you tell the jury actually how you folks made the arrest—in other words, you came up to one side and then what happened?

"A    When I pulled the car over I instructed Sergeant Ledward to get out first because I was in the middle of the roadway.

"Q    Did you say anything to them prior to pulling them over?

"A    I tooted my horn and I motioned and the driver pulled over. However, he didn't pull over, he stopped right there, and this caused me to stop abruptly. Sgt. Ledward got out of the car, I got out on my side and went around on the passenger side. The driver in the meantime had come out of the car with his hands up in the air. Mr. Goudy was still seated in the passenger side.

"Q    You said the passenger side, you mean the driver got out?

"A    The driver got out of the car.

"Q    With his hands up?

"A    Yes. When I went around the vehicle, the passenger side, Mr. Goudy was still there, and I just happened to look in the back seat and I saw the rifle and the sheath partly exposed.

"I then opened the door to have Mr. Goudy come out of the car and I saw the pistol sticking out of the package—the butt end.

"Q   Okay. And then as you pulled up alongside, did you have your pistol drawn?

"A   I did.

"Q   Were you waving at them so that they would know—?

"A   No, not at that point.

"Q   But you did have your weapon drawn when you pulled up. Did Officer Ledward have his drawn also?

"A   I believe so. I am not sure.

\*          \*          \*          \*          \*

"Were there other policemen on the scene?

"A   Several.

"Q   How did they happen to get there?

"A   I called them by radio.

"Q   You called them as you were following the Barracuda?

"A   Yes."

In my opinion the foregoing testimony of the officers definitely indicates that at the outset, with no probable cause, they had intended to arrest the occupants of the black Barracuda, including the defendant, when the driver was ordered to pull over. Otherwise, why were the three other officers on their automobiles directed to converge to the area where the defendant was stopped? And I would hold that as soon as the driver was ordered to pull over the defendant was under arrest. The situation here is very similar to *Henry* v. *United States,* 361 U.S. 98 (1959), where federal agents waved a suspect's automobile to a stop. The Supreme Court held that the arrest took place when the agents stopped the car.

As noted above, this court conceded that until "the door of the Barracuda was opened to let defendant out and the butt end of the Luger pistol was seen in open view

on the floor" there was no probable cause for an arrest. Thus, as the United States Supreme Court has held time and time again such an arrest was illegal and unconstitutional, therefore, the pistol was illegally seized and such evidence should have been suppressed. *Wong Sun* v. *United States,* 371 U.S. 471 (1963); *Henry* v. *United States,* 361 U.S. 98 (1959); *Johnson* v. *United States,* 333 U.S. 10 (1948); *Carroll* v. *United States,* 267 U.S. 132 (1925).

## II.

CAN THE STOPPING OF THE DEFENDANT BE JUSTIFIED AS TEMPORARY DETENTION FOR INVESTIGATORY PURPOSES UNDER *TERRY* v. *OHIO,* 392 U.S. 1 (1968), ASSUMING THAT ARREST HAD NOT TAKEN PLACE WHEN THE DEFENDANT WAS STOPPED BY THE OFFICERS?

It should be emphasized here that *Terry* makes clear that temporary detention for investigatory purposes comes within the purview of the Fourth Amendment of the United States Constitution and the United States Supreme Court at page 16 said:

"There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." (Footnotes omitted.)

Also the Court in *Terry* carefully emphasized at page 30:

"We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken."

It should be noted that the Court at page 19, in its footnote 16, stated:

"We thus decide nothing today concerning the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation. Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred. We cannot tell with any certainty upon this record whether any such 'seizure' took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we thus may assume that up to that

point no intrusion upon constitutionally protected rights had occurred."

In the light of the foregoing statements by the United States Supreme Court, it appears to me that in the absence of probable cause *Terry* cannot and should not be used by this court to support the proposition that under the Fourth Amendment of the United States Constitution or Art. I, § 4 of the Constitution of the State of Hawaii the defendant here was legally "seized" for investigatory purposes.

However, if *Terry* stands for the proposition that an officer may seize a person for investigatory purposes on evidence insufficient to effectuate an arrest, I believe Justice Douglas' dissent in *Terry* is very apropos, where at page 35 he said:

"I agree that petitioner was 'seized' within the meaning of the Fourth Amendment. I also agree that frisking petitioner and his companions for guns was a 'search.' But it is a mystery how that 'search' and that 'seizure' can be constitutional by Fourth Amendment standards, unless there was 'probable cause' to believe that (1) a crime had been committed or (2) a crime was in the process of being committed or (3) a crime was about to be committed.

"The opinion of the Court disclaims the existence of 'probable cause.' If loitering were in issue and that was the offense charged, there would be 'probable cause' shown. But the crime here is carrying concealed weapons; and there is no basis for concluding that the officer had 'probable cause' for believing that that crime was being committed. Had a warrant been sought, a magistrate would, therefore, have been unauthorized to issue one, for he can act only if there is a showing of 'probable cause.' We hold today that the police have greater authority to make a 'seizure' and conduct a 'search' than a judge has to authorize such action. We

have said precisely the opposite over and over again."
(Footnotes omitted.)

I believe Justice Douglas correctly states the law because the United States Supreme Court has explicitly and clearly stated repeatedly that an officer may not act upon less evidence in making an arrest merely by avoiding making an application to a judge for the issuance of a warrant.[1] Thus, it should be emphatically stated that the officers' actions here should be sustained only if their actions would have been permissible had there been a judge at their elbow to issue a warrant.

I think that I am for "law and order," as are all of the other members of this court; however, I do not believe that the pressure of the moment, as may be evidenced by this case, is reason enough for this court to water down a person's fundamental rights under our Constitutions.

### III.

### IS THE TERRY CASE APPLICABLE HERE?

It is to be noted that the United States Supreme Court stated that *Terry* involved the issue of protective search for weapons and at page 29 said:

"Suffice it to note that such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. See *Preston* v. *United States,* 376 U.S. 364, 367 (1964). The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reason-

---

[1] *E.g.,* Carroll v. United States, 267 U.S. 132 (1925); Johnson v. United States, 333 U.S. 10 (1948); McDonald v. United States, 335 U.S. 451 (1948); Henry v. United States, 361 U.S. 98 (1959); Wong Sun v. United States, 371 U.S. 471 (1963).

514

ably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

Thus, I believe *Terry* does not set up guidelines to determine the reasonableness of a temporary detention because as specifically stated the United States Supreme Court did not intend to cover that point and the decision was strictly on the issue of protective search as noted above. Therefore, in my opinion, this court errs in using the guidelines set up in *Terry* to justify protective search to justify temporary detention for investigatory purposes here.

Also, may I ask, what is the guideline which states "an intrusion upon personal liberty must be reasonable and based on something more substantial than inarticulate hunches, and that reasonableness is to be judged by an objective standard, namely, whether the facts known by the officer would warrant a man of reasonable caution to believe that the action taken was appropriate"? Yes, it may sound good and legalistic but it sets up no definite standard.[2] To me, under such a guideline an officer may justify any action he takes if he is a good talker.

Further, I do not believe *Terry* is applicable here. What was the "criminal activity of a violent nature" involved here? The tip to the police was that there might be illegal traffic in guns or jewelry. This information does not in any way denote a "criminal activity of a violent nature."

---

[2] It is to be noted that in *"Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond*, 67 Mich. L. Rev. 40, 64, Professor of Law Wayne R. LaFave, University of Illinois, stated:

"There is to be sure, some dictum in *Terry* which lends support to the proposition that stops for investigation are permissible on evidence insufficient for arrest, but the language affords few hints as to what the proper standards are. It is said, for example, that the officer's conduct should be judged by this 'objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief," that the action taken was appropriate?' It would be hard to quarrel with this generality, although it is unclear what help it offers in the development of police guidelines."

Of course, the guns may later be used in commission of a crime; however, from the information available to the officers, how can this court say that the State was able to point to specific and articulable facts which, taken together with rational inferences from those facts that a crime involving violence was being or to be committed? The crime suspected was the illegal possession of firearms. I do not believe that such offense involves *a high degree of potential violence.*

In my opinion *Sibron* v. *New York,* 392 U.S. 40 (1968), decided on the same day as *Terry,* is closer to the facts of this case. There, the Brooklyn police observed Sibron conversing with six or eight known narcotics addicts. He observed Sibron enter a restaurant and talk to three more known addicts. At this point, the police approached Sibron, told him to come out of the restaurant and upon searching him on the sidewalk found narcotics. The United States Supreme Court held that the search was unlawful because the officer was seeking narcotics rather than acting from fear of his own safety.

I believe *Sibron* v. *New York, supra,* provides a clear factual contrast to *Terry* v. *Ohio.* In both *Terry* and *Sibron* the court emphasizes the reasonableness of a police officer *searching* a suspect when he is justified in believing the person whom he is investigating at close range is armed and presently dangerous to the officer or others.[3] While *Terry* did not address itself to the "stop" or "seizure"[4] *Sibron* did mention that "If [the officer] lacked probable cause for an arrest, however, his *seizure* and *search* of Sibron might still have been justified at the outset if he had reasonable grounds to believe that Sibron

---

[3] Terry v. Ohio, 392 U.S. 1 at 24. Sibron v. New York, 392 U.S. 40 at 63.

[4] "The crux of this case * * * is not the propriety of [the officer] taking steps to investigate * * * but rather, [the search]." *Id.* at 23. See also footnote 16 at p. 19 *and* Harlan J. concurring opinion at 32.

was armed and dangerous."[5]  Of course, *Sibron* also focused on the search because no incriminating evidence arose to justify the stopping of the suspect.  But assuming that for a stop to be "reasonable"[6] there must be the same grounds as for a protective "pat down" then in deciding this case a comparison of *Sibron* and *Terry* should be made.  In *Terry* the Court felt that the reasonable suspicion that the suspects were about to commit a daylight robbery was enough to "make it quite reasonable to fear that they were armed."[7]  However, in *Sibron,* the Court felt it abundantly clear that the officer was only searching for narcotics and those circumstances did not give rise to a "reasonable fear of life or limb."[8]  The Court also noted that the officer never even contended that he acted to protect himself.[9]  Therefore, the court felt that there was not available "particular facts from which [the officer] reasonably inferred that the individual was armed and dangerous."[10]

The record in this case does not support the inference that Goudy was armed and dangerous within the meaning of *Terry* and *Sibron*.  In the first place the investigation involved a transaction in contraband goods.  This brings it within the *Sibron* situation of possession of narcotics and not within the *Terry* situation where an imminent armed robbery was suspected.  The police stated they saw the rifle.  This is the only possible link with *Terry* but is very weak because unlike *Terry* there was no indication that the suspect was presently dangerous to the officer or

---

5 *Id.* at 63 (emphasis supplied).

6 Aside from there being a "reasonable suspicion."

7 *Id.* at 28.

8 *Id.* at 64.

9 *Id.* at 64.

10 *Id.* at 64.

others. There is no indication in the record the police stopped the car to prevent a violent crime from occurring.

It should be also noted that Justice Harlan concurred in both *Terry* and *Sibron* on the grounds similar to those expounded by this court, *i.e.,* that the short investigatory detentions without probable cause may be constitutionally permissible. But unlike in *Terry,* where he felt such a stop was justified, 392 U.S. at 34, in *Sibron* he felt the stop of Sibron was not permissible, 392 U.S. at 73, 74, even though New York Code Criminal Procedure, § 180-a, authorized an officer to stop a person short of an arrest where the officer "reasonably" suspected that the person stopped "is committing, has committed or is about to commit a felony."

Thus, under *Sibron,* the evidence should have been suppressed.

I would reverse.