**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 15 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 03-2311

BRIAN MADDOX,

Defendant - Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D. Ct. No. CR-02-1592-JP)

---

Alonzo J. Padilla, Assistant Federal Public Defender, Albuquerque, New Mexico, appearing for Appellant.

Norman Cairns, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the brief), Office of the United States Attorney, Albuquerque, New Mexico, appearing for Appellee.

---

Before **TACHA**, Chief Circuit Judge, **HOLLOWAY** and **LUCERO**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

Defendant-Appellant Brian Maddox pleaded guilty to one count of being a

felon in possession of a firearm. A sheriff's deputy initially detained Mr. Maddox as an adjunct to a lawful in-house arrest of a third party. At the conclusion of this half-hour detention, a deputy asked Mr. Maddox if he was armed. When Mr. Maddox replied that he was, the deputy seized a gun and narcotics. On appeal, Mr. Maddox challenges the District Court's denial of his motion to suppress this evidence and his sentencing enhancement. We take jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2) and AFFIRM.

## I. BACKGROUND

On July 12, 2002, two federal marshals and a local deputy sheriff, Anthony Medrano, served an arrest warrant on Rachel Page, a fugitive wanted for narcotics trafficking. Ms. Page was staying in the mobile home of Richard "Pops" Buhrle in the sparsely populated westside of Albuquerque, New Mexico. Mr. Buhrle's residence is located in a high crime area and known by local law enforcement officers to be a dangerous place. Because a previous homicide investigation had taken Deputy Medrano to Mr. Buhrle's residence, he personally knew of the dangerousness of the residence prior to Ms. Page's arrest. He also knew that the residence had been the location of numerous violent crimes and that several narcotics traffickers and violent fugitives had been arrested there.

Deputy Medrano and the federal marshals drove an unmarked car down the long driveway to the dimly-lit Buhrle residence at dusk (approximately 8:45

p.m.). As Deputy Medrano and the marshals pulled up, they saw Mr. Buhrle's adult son, Richard Buhrle, Jr., standing in the driveway.[1] The officers asked if Ms. Page was in the residence, and Mr. Buhrle, Jr. said that she was. Deputy Medrano, based upon his knowledge that Mr. Buhrle, Jr. was a homicide suspect with a violent history, asked him to sit down in the carport area near the mobile home. At this point, a car pulled up the driveway. The driver exited and approached Deputy Medrano. Deputy Medrano asked this person to remain seated in the carport as well.

The federal marshals then went into the home to serve the warrant; they remained inside for approximately fifteen minutes. While the marshals were inside, Deputy Medrano stayed outside to prevent others from entering the residence and to ensure that the persons in the carport did not interfere with the arrest.

While the federal marshals were still inside, a pick-up truck carrying three people, including Mr. Maddox, pulled into the driveway. As the truck approached, Deputy Medrano saw Mr. Maddox reach under the seat. Deputy Medrano could not tell whether Mr. Maddox had put something under the seat or was retrieving something from there, and thus interpreted the action as "an

---

[1] The record is somewhat ambiguous as to whether Mr. Buhrle, Jr. was the person standing in the driveway or whether he arrived later.

-3-

unknown threat." Deputy Medrano informed the three new arrivals that there were marshals making an arrest inside and asked them to stay in the carport area.

Deputy Medrano now had five people under surveillance—three unknown individuals, one person he knew to be violent, and Mr. Maddox, who had begun to act erratically; he ignored Deputy Medrano's instructions and paced in circles farther and farther away from the carport, and at one point he urinated in the carport. Nevertheless, Deputy Medrano did not handcuff anyone nor did he unholster his sidearm. Rather, he asked these people to remain seated in the carport for the remainder of Ms. Page's arrest.

A few minutes later, another vehicle, carrying only a driver, arrived at the residence. Deputy Medrano asked this person to sit in the carport. When two more people arrived, Deputy Medrano directed them to the carport as well—bringing the total number of people detained to eight. During this time, one person threw an item—later found to be drug paraphernalia—underneath one of the vehicles in the driveway. At this point, feeling outnumbered by the group, concerned about his and the marshals' safety, knowing the violent history associated with this residence, and considering Mr. Maddox's threatening behavior, Deputy Medrano called for backup.

While Deputy Medrano was waiting for backup, the marshals exited the residence with Ms. Page. Ms. Page, however, could not be taken immediately

from the premises. Local protocol requires having a female officer pat down a female suspect during her arrest, and a marked car must be used to take the suspect away. Because Deputy Medrano and the federal marshals were all male and had arrived in an unmarked car, Ms. Page's arrest could not be concluded until a female officer arrived in a marked car.

Prior to the arrival of the female officer, additional deputies arrived in response to Deputy Medrano's call for backup. Deputy Medrano instructed the arriving officers to pat down the persons in the carport for weapons. Deputy Medrano informed one of the officers, Deputy McCoy, that Mr. Maddox had been acting suspiciously and instructed him to separate Mr. Maddox from the group. Deputy Medrano testified that he requested the separation of Mr. Maddox from the group because, at that time, he considered him a critical and deadly threat.

After moving him away from the group, Deputy McCoy asked Mr. Maddox for identification. Mr. Maddox supplied his name but stated that he had recently lost his driver's license. Deputy McCoy then asked Mr. Maddox if he had any weapons or drugs. Mr. Maddox replied that he was carrying a concealed gun. Deputy McCoy, after handcuffing and disarming Mr. Maddox, asked him if he had drugs. Mr. Maddox responded that he had methamphetamine and a scale. Deputy McCoy took possession of these items and arrested Mr. Maddox. The entire encounter, from the arrival of Deputy Medrano and the federal marshals to

Mr. Maddox's arrest, took approximately a half hour. This encounter occurred entirely within the period when Deputy Medrano was waiting for a female officer to arrive and conclude Ms. Page's arrest.

The Government brought three counts against Mr. Maddox: (1) felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a); (2) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (3) carrying a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c). Arguing that the deputies ran afoul of the Fourth Amendment to the Federal Constitution by detaining and questioning him, Mr. Maddox moved to suppress the gun and methamphetamine as evidence. After considering the totality of the circumstances, the District Court denied the motion.

As a result, in exchange for the Government's agreement to drop the second and third counts, Mr. Maddox entered into a conditional plea agreement, reserving the right to appeal the motion to suppress and any sentencing errors. At sentencing, the District Court enhanced Mr. Maddox's sentence pursuant to 18 U.S.C. § 924(e) and U.S. Sentencing Guidelines Manual § 4B1.4 (2002) ("U.S.S.G."), to account for his previous escape from prison. Mr. Maddox filed a timely motion of appeal that challenges both the motion to suppress ruling and the sentencing enhancement.

## II. MOTION TO SUPPRESS

The District Court found that Mr. Maddox was seized for Fourth Amendment purposes when Deputy Medrano instructed that he remain in the carport.[2]  Nevertheless, it held that given the totality of the circumstances this seizure was reasonable at its inception and that Mr. Maddox voluntarily answered Deputy McCoy's inquiries concerning weapons and narcotics.  On appeal, Mr. Maddox argues that the initial seizure was constitutionally unreasonable and that he did not voluntarily inform Deputy McCoy that he possessed a gun and narcotics.

### A.    Standard of Review

When reviewing a district court's ruling on a suppression motion, "we accept the district court's factual findings absent clear error and review de novo the district court's determination of reasonableness under the Fourth Amendment." *United States v. Olguin-Rivera*, 168 F.3d 1203, 1204 (10th Cir. 1999).

### B.    Reasonableness of the Detention

Mr. Maddox first argues that Deputy Medrano unreasonably detained him in the carport area.  "[T]he Fourth Amendment's protection against 'unreasonable

---

[2]Both parties agree that Mr. Maddox was in fact seized for Fourth Amendment purposes when Deputy Medrano detained him in the carport.  Hence, we assume arguendo that he was seized.

. . . seizures' includes seizure of the person." *California v. Hodari D.*, 499 U.S. 621, 624 (1991) (citation omitted). Any evidence obtained as a result of an illegal seizure is subject to the exclusionary rule. *Weeks v. United States*, 232 U.S. 383, 398 (1914) (establishing the exclusionary rule). Mr. Maddox invokes this rule.

The Fourth Amendment does not prohibit all searches and seizures; rather, only unreasonable searches and seizures are prohibited. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . ."). Prior to *Terry v. Ohio*, 392 U.S. 1 (1968), Fourth Amendment seizures of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 208 (1979). *Terry* was the first case to recognize that "the Fourth Amendment governs 'seizures' of the person . . . [other than] 'arrests,'" *Terry*, 392 U.S. at 16, and it created a "narrowly drawn" exception to the probable cause requirement for lesser governmental intrusions into an individual's liberty, *id*. at 27. Thus, in certain narrowly drawn instances, a law enforcement officer may stop a person without probable cause for arrest if the officer has a reasonable and articulable suspicion that the person might be involved in criminal activity. *Id*. at 21-22, 30. If the officer has such a reasonable and articulable suspicion, he may also conduct a protective frisk of the suspect's outer clothing if he reasonably believes that the suspect might be armed and dangerous. *Id*. at 27, 30.

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Court applied this so-called *Terry* stop rule to "protective sweeps." A protective sweep allows officers to conduct a search of a home without probable cause solely for the purpose of officer protection "as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime." *Id*. at 333. Because the "risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter[,]" *id*., officers may take "steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack[,]" *id*. The Court stressed that this intrusion be "no more than necessary to protect the officer from harm[,]" *id*., and "that the arresting officers are permitted in such circumstances to take [only] reasonable steps to ensure their safety after, and while making, the arrest[,]" *id*. at 334. Finally, the Court held that a protective sweep should "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36.

The Court then established two sets of criteria for evaluating the reasonableness of protective sweeps, which are applied depending on the area in which the search occurs. The Court first held that closets and spaces immediately adjoining the place of arrest may be searched without probable cause or a

reasonable suspicion of potential danger. *Id*. at 334. The Court further held that with "articulable facts which, taken together with the rational inferences from those facts," a reasonably prudent officer who believes that the broader area poses a danger to those on the arrest scene may conduct a protective sweep of the area surrounding the location of the arrest. *Id*.

The Government argues that *Buie* controls this case. *Buie* is not directly on point, however. In *Buie*, the Court considered the reasonableness of an in-house search incident to an in-house arrest. Here, we consider the reasonableness of a detention taking place outside of a house in which an in-house arrest is occurring. Thus, we first determine whether *Buie* applies to both protective searches and temporary seizures of persons (i.e. "protective detentions"). And if *Buie* encompasses both, we then consider whether these protective searches and detentions are limited to the confines of the house in which the arrest is taking place or whether they can occur in the area immediately outside of the home.

We hold that *Buie* applies to both protective searches and protective detentions because the Court's reasoning in *Buie* supports treating protective sweeps and protective detentions similarly. In authorizing officers to protect themselves by making a limited search for potentially dangerous individuals, the Court stated that officers may take "reasonable steps to ensure their safety after, and while making, the arrest." *Id*. Because the ability to search for dangerous

-10-

individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a "reasonable step[] to ensure the [officers'] safety." *Id*. As such, we find that *Buie*'s two sets of evaluative criteria—one for when the search is immediately adjoining the place of arrest and one for when the search is located in the broader area of the arrest scene—apply to protective detentions as well.

This conclusion—that officer safety may justify protective detentions—is further supported by our decision in *Thompson v. City of Lawrence*, 58 F.3d 1511 (10th Cir. 1995). In *Thompson*, we considered the reasonableness of placing a bystander in temporary protective detention without a reasonable and articulable suspicion of danger when this person is in an immediately adjoining area to the arrestee. *Id*. at 1517. After balancing the bystander's Fourth Amendment interests against the governmental interest in officer safety, we rejected the Fourth Amendment challenge. *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). We reasoned that " [t]he governmental interest in securing the area around [the arrestee] and protecting officers from potential danger is sufficient to justify the temporary detention of [the bystander]." *Id*.; *see also United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) ("A law enforcement agent, faced

with the possibility of danger, has a right to take reasonable steps to protect himself. . . .") (citations omitted).

Because we hold that *Buie* applies to both protective searches and protective detentions, we next consider whether *Buie* limits protective detentions to the area inside the home or whether a detention taking place immediately outside the home falls within *Buie*'s scope. In *Buie*, the Supreme Court described the area in which a protective sweep can be performed as the "arrest scene." *Buie*, 494 U.S. at 334. While the protective sweep performed by the officers in *Buie* extended only to other areas of the home, the Court's opinion does not define the "arrest scene," and thus does not expressly limit the protective sweep to areas within the home.

Here, therefore, we must determine whether the area in which Mr. Maddox was detained was part of the "arrest scene." In making this determination we look to the same concerns that justify protective sweeps and protective detentions. The Supreme Court justified permitting protective sweeps of the arrest scene by noting that such sweeps protect officers from potentially dangerous individuals that may be present nearby. *Id.* Consequently, we conclude that it is proper to consider the reasonable threats posed to the officers when drawing the boundaries of the arrest scene in an individual case.

With this standard in mind, we find that the officer-safety interests at issue

in *Buie* are nearly identical to those in play here. As in *Buie*, the arrest of Ms. Page was done inside the residence. As the Court put it, in that instance "[t]he risk of danger . . . [to law enforcement officers is] as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . .[and puts them] at the disadvantage of being on [their] adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* at 333. Given these similar interests, we hold that the same reasonableness test employed in *Buie* for the protective sweep of the broader arrest area applies to this protective detention. That is to say, we hold that law enforcement officers may only detain individuals on the scene of the arrest who are not within the "immediately adjoining" area of the arrest if the officers "possess a reasonable belief based on specific and articulable facts[,]" that the individual poses a danger to them. [3] *Id.* at 337.

Mr. Maddox attempts to distinguish his case from *Buie*; we disagree. He first contends that this case is not analogous to *Buie* because he was a mere

---

[3]We recognize that by rejecting a bright-line rule that protective sweeps and detentions are limited to within the house, we open the possibility of the "arrest scene" being drawn too broadly by an officer in a future case. Today's ruling, however, does not open Pandora's box. Here, we find the inclusion of the area immediately outside of the Buhrle residence as part of the arrest scene reasonable, in large part, because of the isolated and dangerous nature of the residence. In many other settings—for instance, a crowded urban area or an apartment complex—the arrest scene might properly be drawn much more narrowly.

bystander. Relying on Eighth Circuit precedent, he urges that the reasonable course of action for Deputy Medrano would have been to send him on his way. *See United States v. Clay*, 640 F.2d 157, 162 n.9 (8th Cir. 1981); *United States v. Miller*, 546 F.2d 251, 253-54 (8th Cir. 1976) ("if the defendant had been permitted to leave as requested, no officer's security problem of any kind would have been presented"). We find these Eighth Circuit cases distinguishable.

In *Clay*, the officers were executing a search warrant in a house when the defendant knocked on the door. The officer who answered the door ordered the defendant inside, frisked him, and found a gun. In an effort to justify this action, the officer offered the following as his reasonable, articulable suspicion of danger: "[defendant's] 'hesitation' in complying with the order to enter the house and the danger associated with a white officer in a predominantly black neighborhood placed him in reasonable apprehension of bodily harm." *Clay*, 640 F.2d at 159. The court responded, "[a]n experienced police officer should not be apprehensive about executing a search warrant during the early evening hours in a predominantly black neighborhood that is not a high crime district." *Id*. The court went on to suppress the evidence of the gun, reasoning, in large part, that "[p]olice cannot have grounds for suspicion based solely on the race of the suspect. Although color of skin is an identifying factor, this court has consistently rejected the use of race in combination with other factors to justify

investigative searches and seizures." *Id*. at 159 (citations and quotations omitted). In so doing, the *Clay* court did not, as Mr. Maddox suggests, hold that an officer may never detain a person who has approached the scene of an arrest. Rather, it held that the detainee's race cannot provide the basis for a reasonable and articulable suspicion of criminal activity. *Id.* at 159, 162. On our facts, however, racial profiling is simply not an issue. *Clay* is therefore inapposite. [4]

The *Miller* case is similarly off-point. In *Miller*, officers were executing a narcotics search warrant when they conducted a frisk of the defendant "because of the nature of how he was sitting at the table[, because] . . . he had a shirt on, a white, bluish print shirt that was hanging over his pants, and because of . . . the nature of him wanting to get out of there[.]" *Miller*, 546 F.2d at 252. We certainly agree with the Eighth Circuit that the failure to tuck in one's bluish shirt while sitting at the kitchen table, coupled with a natural desire to leave the scene of a narcotics investigation, does not meet the reasonable and articulable suspicion standard. The grounds provided by Deputy Medrano, however, are a far cry from the mere hunch offered up by the officer in *Miller*.

Mr. Maddox next argues that *Ybarra v. Illinois*, 444 U.S. 85 (1979), should

---

[4]Moreover, the Eighth Circuit intimated that on facts similar to those at issue in this case, the stop and frisk may have been reasonable. *Clay*, 640 F.2d at 160 (defendant's conduct "falls far short of those cases dealing with . . . inexplicable sudden movements toward a pocket or other place where a weapon could be concealed").

control this case. In *Ybarra*, the defendant, a patron at a public tavern, was searched in connection with an arrest warrant being served on the tavern's bartender. The Court held that this search was unreasonable because " a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id*. at 91. Mr. Maddox argues that he too was searched based on his mere propinquity to a person independently suspected of criminal activity, Ms. Page, and therefore the search violated his Fourth Amendment rights.

*Ybarra* stands for the proposition that "mere propinquity to others independently suspected of criminal activity" is insufficient, standing alone, to create an articulable suspicion to support a *Terry* frisk. *Id.* The search and seizure in *Ybarra* violated the Fourth Amendment because the officer had no reason—other than the fact that he was present in a tavern in which narcotics were being sold—to search Mr. Ybarra. The Court noted that Mr. Ybarra's "hands were empty" and that he "gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening." *Id.* Based on these facts, the Court held that "the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous." *Id*. at 93. *Ybarra,* therefore, would only control in this

case if we determine that Deputy Medrano did not have a reasonable and articulable suspicion that the defendant was armed and dangerous. As we explain below, Deputy Medrano had a reasonable and articulable suspicion that Mr. Maddox posed a threat.

Because we find that the risks faced by the officers here are nearly the same as, if not identical to, those faced by the officers in *Buie* and therefore apply the same reasonableness test employed in *Buie*, the question we face is: Did Officer Medrano have a reasonable and articulable suspicion that Mr. Maddox posed a threat to the officers on the scene that justifies the detention of Mr. Maddox in the carport for the duration of Ms. Page's arrest, an activity that took approximately half an hour?

In determining whether Deputy Medrano had reasonable and articulable suspicion to justify the detention, we consider the totality of the circumstances, s*ee United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996), and balance Mr. Maddox's Fourth Amendment interests against the governmental interest in officer safety, *Thompson*, 58 F.3d at 1517. While our reasonableness determination " must be based on commonsense judgments and inferences about human behavior[,]" a mere "inchoate and unparticularized suspicion or 'hunch'" cannot satisfy this reasonableness requirement. *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). Therefore, a protective detention justified on officer safety

grounds is "decidedly not 'automatic,' but may be conducted only when justified by a reasonable, articulable suspicion that . . . a person pos[es] a danger to those on the arrest scene." *Buie*, 494 U.S. at 336.

Here, Deputy Medrano's articulable and reasonable suspicion of potential danger supports the temporary, protective detention of Mr. Maddox on officer safety grounds. [5] First, Deputy Medrano was assisting in the arrest of a narcotics trafficker. Such arrests are notoriously and routinely dangerous. [6] Second, Deputy Medrano knew the Buhrle residence to be a dangerous location because he had investigated a homicide there, he knew that the residence had been the location of violent crimes, and he knew that several narcotics traffickers and violent fugitives had been arrested there. Third, it was getting dark. Fourth, at the time Mr.

---

[5]The Government argues that the "community caretaking" doctrine allows this detention. We disagree. Our cases specifically limit this doctrine to vehicle searches. *United States v. Thomson*, 354 F.3d 1197, 1200 n.1 (10th Cir. 2003) ("the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches") (quotation omitted); *United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) (same). Therefore, we do not consider community caretaking in our Fourth Amendment reasonableness analysis.

[6]"Indeed, our notion of what is reasonable police conduct has long reflected the heightened danger and risk of violence posed by cocaine trafficking." *Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1330 (D.C. Cir. 2000); *see also Shareef*, 100 F.3d at 1506; *United States v. Becerra*, 97 F.3d 669, 671-72 (2d Cir. 1996) (reasonable to suspect that "drug dealers commonly keep firearms on their premises as tools of the trade") (citations and internal quotations omitted); *United States v. White*, 648 F.2d 29, 36 n.29 (D.C. Cir. 1981) (study of drugs and violence justifies police drawing weapons because "odds [are] too high to require policemen to play 'russian roulette' each time they effect a drug arrest").

Maddox arrived, Deputy Medrano was outnumbered 5-to-1. And fifth, Deputy

Medrano had observed Mr. Maddox reach under the seat of the pick-up truck as it

pulled up the driveway. We also note that the possibility that Mr. Maddox was

visiting another home or was merely passing by was extremely unlikely as the

Buhrle residence was the only mobile home at the end of the long driveway in a

rural area.

Mr. Maddox argues that many of these factors, when individually

considered, would not justify a protective detention. *See Florida v. J.L.*, 529 U.S.

266, 273 (2000) (suspicion that defendant is armed, standing alone, is insufficient

to justify a *Terry* stop); *Brown v. Texas*, 443 U.S. 47, 52 (1979) (presence in an

area of expected criminal activity, standing alone, is not enough to support a

*Terry* stop); *Sibron v. New York*, 392 U.S. 40, 64 (1968) (talking to known drug

addicts, standing alone, is insufficient to support a *Terry* stop). But we consider

the totality of the circumstances. Hence, even if one factor would be insufficient

standing alone, it may be considered as one of the many factors in determining the

reasonableness of Deputy Medrano's conduct.

The Court addressed this very issue just four years ago in *Wardlow*. 528

U.S. 119 (2000). There, the defendant argued that the officers lacked a

reasonable and articulable justification to perform a *Terry* stop because fleeing

and propinquity to a high-crime area are insufficient justifications for such a stop

when standing alone.  The Court, while agreeing that standing alone these justifications are insufficient, held that these grounds could be considered in the overall reasonableness analysis.     *Id*. at 124-25. "[O]fficers   are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id*. at 124.  Moreover, even though "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation[,]" officers may "detain the individuals to resolve the ambiguity[.]" *Id.* at 125; *see also Terry*, 392 U.S. at 30.

We hold the Court's *Wardlow* analysis equally applicable in the protective detention scenario and find Deputy Medrano's protective detention of Mr. Maddox, which is justified by reasonable and articulable suspicion of potential danger to the federal marshals and himself    , reasonable in light of the totality of the circumstances.  While standing alone, many of the rationales Deputy Medrano relied upon would be insufficient to justify the protective detention, when the totality of the circumstances are considered, however, his action was reasonable.[7]

---

[7]The Government also argues that *United States v. Reid*, 997 F.2d 1576 (D.C. Cir. 1993), controls the outcome of this case. In *Reid*, the court upheld the *Terry* stop of an individual leaving the location to be searched for narcotics simply because the officer said "he felt endangered by [the defendant's] potential presence behind the police officers as they . . . execute[d] the search warrant." *Id.* at 1579.  The court differentiated *Ybarra* because "[c]ommon sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an

(continued...)

We further hold, as a part of our reasonableness analysis, that not only must the seizure be justified at its inception, but that the scope of seizure employed must also be reasonable under the circumstances. *See Terry*, 392 U.S. at 20-21 (a seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place"). Deputy Medrano, unlike the officers in *Thompson* , did not initially handcuff Mr. Maddox, draw his weapon, or treat him with indignity. *Cf. Michigan v. Summers*, 452 U.S. 692, 702 (1981) (" the detention in this case . . . involve[d] neither the inconvenience nor the indignity associated with a compelled visit to the police station"). As such, we find that Deputy Medrano employed no more force than was necessary for officer protection in temporarily detaining Mr. Maddox.

To be clear, our holding is not a carte blanche for law enforcement officers to detain any third party, using any means, as an adjunct to a lawful arrest. To

---

[7](...continued)
individual who happens to be in a public tavern where the bartender is suspected of possessing drugs." *Id.* at 1578-79. The court also differentiated *Sibron* because "[t]here is more reason to suspect that an individual who is present in a private residence containing drugs is involved in illegal drug activity than someone who merely holds conversations with drug addicts in public places." *Id*. at 1579. We decline to apply the reasoning of *Reid* to this case because under our totality of the circumstances precedent, the officers in this case had reasonable and articulable suspicion that Mr. Maddox posed a threat to the officers as they arrested Ms. Page.

the contrary, we apply the same limitations as the Court did in *Buie*. Thus, the protective detention must be for officer safety purposes only, based upon a reasonable and articulable suspicion of potential danger to the arresting officers. *See Buie*, 494 U.S. at 333. Further, the protective detention must be "no more than necessary to protect the officer[s] from harm[,]" *id*., "tak[ing only] reasonable steps to ensure their safety after, and while making, the arrest[,]" *id*. at 334. Finally, the protective detention should "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36. These conditions were met here.

C.    Reasonableness of Questioning

Mr. Maddox presents two arguments challenging the voluntariness of his admission to Deputy McCoy that he was armed and carrying methamphetamine. First, he urges that because his initial detention was unconstitutional the subsequent questioning was as well. Because we hold that the initial detention was constitutional, this argument is unpersuasive.

Second, Mr. Maddox argues, without citation to legal authority, that because he observed others being patted down he assumed he would be as well, regardless of his responses to Deputy McCoy. Thus, he asserts his responses were involuntary. The Government counters that following a legal detention an officer

may ask persons being detained if they are armed even when the officer lacks reasonable suspicion or probable cause. *See United States v. Holt*, 264 F.3d 1215, 1226 (10th Cir. 2001) (en banc) (Ebel, J.) ("Given the dangers inherent in all traffic stops, we hold that the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons."). Mr. Maddox retorts that *Holt* is inapplicable here as it is limited to the questioning of detained motorists. We need not decide today whether to extend *Holt* to the non-vehicle context because deputies Medrano and McCoy had a reasonable and articulable suspicion that Mr. Maddox was dangerous.

Under *Terry*, the reasonableness of a search or seizure depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20. As we discussed above, the initial detention of Mr. Maddox was reasonable on officer safety grounds. Deputy Medrano was assisting in the arrest of a narcotics trafficker at a residence he knew to be dangerous; it was getting dark; Deputy Medrano was outnumbered 5-to-1; and he had observed Mr. Maddox reach under the seat of pick-up truck as it pulled up the driveway. Further, it was unlikely that Mr. Maddox was merely passing by the residence, and his behavior after being asked to remain in the carport – incessant pacing, leaving the carport area, urinating in the carport – reasonably heightened Deputy

Medrano's suspicions that Mr. Maddox was dangerous. Given these reasonable and articulable grounds, the officer could have, consistent with *Terry*, performed a protective patdown of Mr. Maddox. *Id*. at 27, 30. Deputy McCoy, however, merely asked a question about firearms, which is less intrusive than a frisk, and is equally justified under these circumstances.

Based upon many of these same facts, Deputy McCoy also had a reasonable and articulable suspicion that Mr. Maddox possessed narcotics. *See United States v. Soto-Cervantes*, 138 F.3d 1319, 1322-23 (10th Cir. 1998). We hold, therefore, that Deputy McCoy's questioning of Mr. Maddox was reasonable given the totality of the circumstances.

## III.  SENTENCING ENHANCEMENT

Mr. Maddox also challenges his sentencing enhancement. The District Court reasoned that Mr. Maddox's previous failure to return to prison during a work-release program constituted an escape from prison. Relying on precedent from this Court, the District Court enhanced the sentence as a "violent felony" under 18 U.S.C. § 924(e)(1) and U.S.S.G. § 4B1.4. Mr. Maddox contends that his failure to return from the work-release program does not constitute a violent felony. We review de novo a sentence enhancement under § 924(e) and examine the entire record and supporting documentation to determine the legitimacy of the trial court's sentence. *United States v. Adkins*, 196 F.3d 1112, 1118 (10th Cir.

1999).

Mr. Maddox's counsel, in accordance with his duty as an officer of the court, candidly admits that Tenth Circuit precedent forecloses his argument. We agree. *See id.*; *see also United States v. Nichols*, 169 F.3d 1255, 1261 (10th Cir. 1999); *United States v. Moudy*, 132 F.3d 618, 620 (10th Cir. 1998). He raises the argument here in order to preserve the issue for a possible certiorari petition to the Supreme Court. Counsel properly preserved the issue.[8]

## IV. CONCLUSION

Because we find, given the totality of the circumstances, that a protective detention and the questioning of Mr. Maddox were reasonable, and that the District Court properly enhanced Mr. Maddox's sentence, we AFFIRM.

---

[8]Neither of the parties argued whether *Blakely v. Washington*, — U.S. —, 124 S. Ct. 2531 (2004), affects this case and we make no assumptions regarding this issue.