**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 27, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

SHAWN CONRAD GORDON,

        Defendant - Appellant.

No. 12-4170

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:11-CR-00743-DAK-1)**

Scott Keith Wilson, Assistant Federal Public Defender (Kathryn N. Nester, Federal Public Defender, with him on the brief), Federal Public Defender's Office, Salt Lake City, Utah, for Defendant – Appellant.

Paige Peterson, Assistant United States Attorney (David B. Barlow, United States Attorney, Diana Hagen, Assistant United States Attorney, with her on the brief) Office of the United States Attorney, District of Utah, Salt Lake City, Utah, for Plaintiff – Appellee.

Before **LUCERO**, Circuit Judge, and **BRORBY**, and **O'BRIEN**, Senior Circuit Judges.

**O'BRIEN**, Senior Circuit Judge.

This interesting case calls upon us to decide whether, incident to an arrest for

aggravated assault, police may seize a shotgun from a home when the weapon was not

involved in any apparent criminal offense, the crime scene had been secured, and there was no immediate danger to any individual.  Our answer to that question−NO−begs another.  Does a *de minimis* violation of a defendant's property rights make a seizure constitutionally unreasonable and thereby justify suppressing evidence, particularly when suppression is highly unlikely to deter improper police behavior?  Our answer, on the unique facts of this case, is, again, no.

### BACKGROUND

At approximately 5:00 p.m. on June 5, 2011, Brandi Thaxton called 911 to report an incident of domestic violence which had occurred two days earlier.  The call was transferred to a police dispatcher.  Thaxton told the dispatcher she was in the basement of the home she shared with her boyfriend, Shawn Gordon, and another male roommate, who had outstanding warrants for his arrest.  Thaxton was upset and crying.  Her voice was lowered so as not to be heard by Gordon, who was upstairs.  Thaxton said she and Gordon had been arguing two days before when he pushed her against the wall, causing her to fall, hurt her arm and neck, and break her glasses.  Gordon then grabbed a samurai sword and swung it at her.  She told the dispatcher her neck continued to be painful and she needed to see a doctor, but she did not clearly respond when the dispatcher asked if she needed an ambulance.  She said she and Gordon had fought earlier that day about getting her help, but she thought she could get herself to a doctor.

When the dispatcher asked about the location of the sword, Thaxton said it was in the basement with several others and there were all sorts of weapons all over the house.

- 2 -

The dispatcher asked if she could answer the door when the police arrived. Thaxton responded, "I guess, if he doesn't kill me first." (R. Vol. I at 51.) She said Gordon had previously been abusive and threatened her, he was on probation, and if he and the roommate discovered she had called police, "seriously, they are going to hurt me." (*Id.*)

Officer Barney arrived with two other officers and entered without Gordon's consent. Barney went directly to the basement while the other officers stayed upstairs with Gordon. When Barney arrived in the basement hallway, Thaxton immediately ran toward him. According to Barney:

> She looked absolutely terrified, the deer in the headlight look. Her eyes were red and puffy. It was obvious she had been crying. And her first statement to me was, he's going to kill me for calling you. She repeated that several times.

(R. Vol. II at 96.)

Barney tried to calm her and told her a medical team was on its way. Thaxton started telling Barney what happened. She was upset about her glasses and wanted to show them to him. As she led him down the hall to the bedroom, Barney noticed an unstrung crossbow and, near the bedroom door, an unzipped gun case with the stock of a gun protruding from it. For safety reasons, he took possession of what turned out to be a loaded shotgun. He did not take the crossbow. As they returned from the bedroom, Thaxton showed him three swords hanging on a tiered holder in the hallway at the bottom of the stairs. Because she could not remember which one Gordon had used to threaten

- 3 -

her, Barney seized all of the swords. Medical personnel arrived shortly thereafter and Barney removed the shotgun and swords from the home.

Barney then asked Gordon about Thaxton's statements. Gordon said he and Thaxton had argued two days before but nothing else happened. Barney arrested Gordon for aggravated assault while Thaxton was being evaluated by the medical team in the basement. After Thaxton was taken to the hospital, Barney locked the house and transported Gordon to the county jail. The officers retained possession of the shotgun. While en route to the jail, Barney learned of Gordon's prior felony conviction, which prohibited him from possessing a firearm.[1]

## PROCEDURAL BACKGROUND

Gordon was charged in a one-count indictment of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the evidence found during the warrantless search of his home, most specifically the shotgun.

Following a hearing at which Barney was the only witness, the district judge denied the motion to suppress. He decided three things: (1) the officers' belief of immediate danger to Thaxton was reasonable; (2) Barney did not exceed the scope of the search because Thaxton consented[2] to his presence in the basement; and (3) Barney had

---

[1] At oral argument, the parties conceded this fact.

[2] At oral argument, the government abandoned Thaxton's consent as a justification for Barney's presence in the bedroom.

probable cause to look at the glasses and seize the swords and the firearm, which were in plain view.

After the motion was denied, Gordon pled guilty but reserved the right to appeal from the denial of his motion to suppress. He was sentenced to six months imprisonment and supervised release for three years. Exercising his reserved right to appeal, he now makes the same arguments presented to the district court.[3]

## DISCUSSION

A. Entry Into the Home and Bedroom

"The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir.1992). We review the district court's factual findings for clear error and view the evidence in the light most favorable to the district court's findings. *United States v. Rhiger*, 315 F.3d 1283, 1287 (10th Cir. 2003). "The ultimate question regarding the reasonableness of the search is a question of law which we review *de novo*." *Id.* (quotation omitted).

---

[3] In the district court he argued: (1) the officers entered without justification because there was no immediate danger or threat of injury; (2) even if the officers could enter based on Thaxton's 911 call, they exceeded the reasonable scope of the search when Barney followed Thaxton into the bedroom without Gordon's consent; and 3) even if Barney was properly in the bedroom, he had no reason to seize the firearm because he had no information which would relate the gun to a crime.

In response, the government posited that the officers were justified in entering the home based on a reasonable belief of danger to Thaxton and argued Barney did not exceed the scope of the search by merely following her into the bedroom at her insistence. And finally, because the shotgun was in plain view, Barney was justified in seizing it for safety reasons.

The Fourth Amendment prohibits unreasonable searches and seizures. "[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 475-76 (1971). "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). In other words, the Fourth Amendment does not prevent a warrantless government search of one's home, but it does guarantee "that no such search will occur that is 'unreasonable.'" *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990).

"Officers do not need probable cause if they face exigent circumstances in an emergency." *Armijo ex rel Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1075 (10th Cir. 2010). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). In determining whether the risk of personal danger creates exigent circumstances, we use a two-part test: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). To determine whether officers had an objectively reasonable basis, "[w]e evaluate whether the officers were

- 6 -

confronted with reasonable grounds to believe there was an immediate need 'guided by the realities of the situation presented by the record' from the viewpoint of 'prudent, cautious, and trained officers.'" *Id.* at 718-19 (quoting *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998)).

Barney's initial entry was reasonable due to exigent circumstances. Although the actual violence had occurred two days previously, at the time Barney entered the home, dispatch had, correctly, reported several things to the responding officers: Thaxton was too frightened to leave the basement; she was upset, crying, and afraid she would be seriously harmed when Gordon discovered she had contacted the police.[4] Any officer could reasonably believe an unprotected victim in that situation was in imminent danger of serious harm. But that does not end the reasonableness debate because a search must be reasonable not only in its inception but also in its execution. *See Wilson v. Layne*, 526 U.S. 603, 611 (1999) ("'If the scope of the search exceeds that permitted by the terms of a validly issued warrant *or the character of the relevant exception from the warrant requirement*, the subsequent seizure is unconstitutional without more.'") (quoting *Horton v. California*, 496 U.S. 128, 140 (1990) (emphasis added)).

Gordon says Barney exceeded the reasonable scope of his search when he followed Thaxton into the bedroom to view her broken glasses. He maintains that once

---

[4] Gordon claimed the exigent events were stale but did not contest Thaxton's immediate fear as it was presented to the dispatcher.

- 7 -

the officers secured him upstairs, and Barney had contacted Thaxton in the basement, the exigency ceased and further intrusion into the home was unreasonable. Not on these facts. At the point Barney accompanied Thaxton into her bedroom to retrieve her glasses, he had been told she was in fear for her life, and there were weapons throughout the house. Moreover, Barney had no information as to the whereabouts of the roommate, whether there was outside access to the basement, or the stability of the situation upstairs. It was not unreasonable to accompany Thaxton while she retrieved her glasses, which she was determined to do. Also, there was good reason to remain in the basement, away from Gordon, while waiting for the medical team.

B. Seizure of the Gun

If the entry into the home and the bedroom did not violate the Fourth Amendment, was the seizure of the gun justified by the "plain view" doctrine? The government says yes; Gordon says no. We agree with the government, but, as we explain, only partially.

If an officer is lawfully positioned in a place from which an object can be plainly viewed, the officer is permitted to notice whatever is put on display and the observation of the article is generally not considered a search. *Horton*, 496 U.S. at 134. "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id*. at 133.

However, the seizure of an object "would obviously invade the owner's possessory interest." *Id*. at 134. As a result, an object in plain view may be seized only

where the incriminating character of the object is "immediately apparent" to the officer and the officer has a lawful right of access to the object itself. *Id*. at 136-37 (quotation omitted). An officer may not expand a warrantless search beyond "the exigencies which justify its initiation." *Id*. at 140.

"If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then its incriminating nature is not immediately apparent and "the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Before Barney obtained the records check (while transporting Gordon to jail), he had no reason to believe the gun was incriminating so it could not be indefinitely seized, even though it was in plain view. But this does not mean Barney could not temporarily seize it for safety reasons.

Temporary seizures of persons or objects may be permissible when reasonably connected to the safety of officers, *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004), or the protection of others. *Armijo*, 601 F.3d at 1075 (noting officers entered and seized Mr. Armijo not during a routine investigation but in an emergency); *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010); *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir.2003) ("[A] police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety."); *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979) ("Although the incriminating nature of the handgun may not have been immediately

- 9 -

apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer . . . seems a reasonable precaution to assure the safety of all persons on the premises during the search.").

We do not question the reasonableness of Barney's temporary seizure of the shotgun. But the government seeks to extend the meaning of "temporary seizure" to a time beyond that necessary to stabilize the situation and eliminate the risk of immediate harm. It first emphasizes that Barney discovered Gordon was a felon only a short time after driving away from Gordon's secured home. It next states the obvious: when Barney learned of the prior conviction, the incriminating nature of the temporarily seized shotgun became known—it was contraband and subject to seizure as an illegal weapon possessed by a felon. The problem with this argument is that Barney did not realize the gun was contraband until Thaxton was safely off the premises en route to the hospital, Gordon was in custody en route to jail, and the house was secured. That makes Gordon's argument technically correct.

Prior to learning of Gordon's felony conviction, Barney had no reason to continue the temporary seizure. He should have returned the gun to its place in the home before leaving. Had the gun been returned and Barney later became aware of Gordon's felony conviction, what would have occurred? Barney would then have had probable cause to

again seize it, but there were no exigent circumstances, at least not as this record stands.[5]

He could not re-enter the house without a warrant. *See DiCesare v. Stuart*, 12 F.3d 973, 978 (10th Cir. 1993) ("Although the initial entry may have been supported by the exigency, . . . this exigency dissipated when the officers decided to return to the premises for the purpose of seiz[ure] . . . ").

Distilled to its essence, the government's argument comes down to this: the police can always seize and indefinitely keep any weapon they find when responding to a family violence complaint. We cannot agree. In *United States v. Davis*, we declined to blindly apply the emergency assistance exception to every domestic violence situation. 290 F.3d 1239, 1244 (10th Cir. 2002). The permissible parameters justifying a seizure, particularly a seizure from a home, are well-established. None justify the rule suggested by the government's arguments. We do not retreat from the view expressed in *Davis*:[6] there is

---

[5] At oral argument, the government offered post hoc rationales to explain why Barney would have taken the gun to the police station. One was the potential danger to Thaxton upon her return to the house, but such danger would not be imminent. She had been rescued from her isolation and taken to a safe place for treatment. Returning to the home alone would have been her considered choice and any danger, imminent or otherwise, would be of her making. Prior to her return, she would be able to secure a family violence restraining order or a civil standby to assist in obtaining her property. The government's other rationale−the possible reappearance of the roommate−is short on facts and long on speculation. There were no exigent circumstances after Barney left the premises.

[6] In *Davis*, officers investigating a 911 call, knocked and were met at the door by Davis, who was soon joined by Ms. Coleman, the presumptive 911 caller. When Davis refused entry, the officers said they were coming in anyway. Davis opened the door, told

(Continued . . .)

- 11 -

no per se exception to constitutional constraints in 911 cases. Structured analysis is always necessary. *See, e.g., Najar*, 451 F.3d 718-20. That said, our work is not done.

We must determine if Barney's intrusion on Gordon's possessory interest in the gun was unreasonable. The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable, at their inception or in their execution. *See Rodriguez*, 497 U.S. at 183. Many courts have held *de minimis* intrusions into a person's possessory interest in property, and even liberty interests, are not constitutionally unreasonable. An example is *United States v. Jacobsen*, 466 U.S. 109 (1984).[7] There, in

---

Coleman to go outside, and retreated into the house. Looking at unique case facts, we determined the officers did not face exigent circumstances because: (1) they had spoken with Coleman outside of the home and saw no signs of harm; (2) they knew Davis had children and that was why he went inside, leaving the officers and Coleman outside; and (3) Davis neither acted in an aggressive manner nor had a history of violence. *Id.* at 1243.

[7] Employees of a private freight carrier damaged a package and opened the package to examine its contents pursuant to a written company policy relating to insurance claims. They discovered a tube containing four plastic bags "nested" one inside the other. The innermost bag held about six and one-half ounces of white powder. They immediately notified the Drug Enforcement Administration ("DEA"), but before the DEA agent arrived, they replaced the plastic bags in the tube and returned it to the original container. When the agent arrived, he observed the box top was open and the tube inside the box had been cut open. After the agent removed the four plastic bags and observed the white powder, he immediately conducted a field test and determined the powder was cocaine. On the strength of this information, the DEA obtained a search warrant for the package's destination and the defendants were indicted for possessing an illegal substance with intent to distribute. The defendants filed a motion to suppress on the ground the warrant was the product of an illegal search and seizure.

The Supreme Court noted the agent had not violated the Fourth Amendment by viewing what a private party had freely made available and removing the tube and plastic bags disclosed nothing more than what had been disclosed by the private search.

(Continued . . .)

- 12 -

addition to deciding other issues, the Court considered whether the field test of a powder, which exceeded the scope of a proper private search, constituted an unlawful "search" or "seizure" under the Fourth Amendment. It concluded, "[t]o the extent that a protected possessory interest was infringed, the infringement was *de minimis* and constitutionally reasonable." *Id*. at 126; *see also Unites States v. Munoz*, 590 F.3d 916, 922 (8th Cir. 2010) (holding even if defendant remained seized for five minutes after the citation and documents were returned to him, any violation was *de minimis*) (listing other cases of *de minimis* violations); *United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) (noting even if a car was seized without reasonable suspicion while waiting for a dog-sniff, the time between the end of the traffic stop and the dog's alert was a "*de minimis* intrusion on [the] defendant's liberty interest"); *United States v. Enslin*, 327 F.3d 788, 795-96 (9th Cir. 2003) (holding marshal's order to show hands was a *de minimis* seizure); *United States v. Contreras-Cortez*, 41 F. App'x 252, 255 (10th Cir. 2002) (unpublished) (*de minimis* seizure governed by *United States v. Jacobsen*).

To assess the reasonableness of the officer's conduct, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Jacobsen*, 466 U.S. at 124-25 (quotation omitted). As we have explained, Barney was justified in temporarily seizing the gun. Barney's only error was in not returning it before securing

---

*Jacobsen*, 466 U.S. at 119–120.

the house (a decision that might, debatably, be justifiable under slightly different circumstances). This record does not reveal whether the omission was oversight or calculated, but on these facts it does not matter. What matters is that Gordon was improperly deprived of his property for only a few minutes−the elapsed time between locking the house and discovering Gordon was a convicted felon−and while he was legitimately in custody. The extended seizure was a *de minimis* intrusion on Gordon's rights and cannot justify suppression of the shotgun as evidence,[8] particularly when the error was seemingly benign and the curative remedy of inevitable discovery is palpably present (even though it was not raised).[9] "Under these circumstances, the safeguards of a warrant would only minimally advance Fourth Amendment interests." *Id*. at 125.

AFFIRMED.

---

[8] Suppression of the shotgun would be more symbolic than real. The fruit of the poisonous tree doctrine applies the exclusionary rule to "the admission of physical evidence and live testimony obtained directly or indirectly through the exploitation of unconstitutional police conduct." *United States v. Griffin*, 48 F.3d 1147, 1150 (10th Cir. 1995). It does not apply here. Barney had not violated the Fourth Amendment at the time he saw the shotgun. Barney, Thaxton, and perhaps others, could describe the shotgun and testify as to its presence in the home whether or not the shotgun itself was admissible evidence.

[9] For a recent discussion of the rule, *see United States v. Christy*, 2014 WL 26455 (10th Cir. No. 12-2127 Jan. 3, 2014).