STATE OF HAWAII, Plaintiff-Appellee, *v.* MICHAEL PATRICK WARD, Defendant-Appellant

NO. 6896

SEPTEMBER 10, 1980

RICHARDSON, C.J., OGATA, MENOR, JJ.,
RETIRED JUSTICES MARUMOTO AND KOBAYASHI
ASSIGNED BY REASON OF VACANCIES

---

[4] We find the defendant's other specifications of error to be completely without merit.

*Per Curiam.* This is an appeal by the defendant who was convicted of the offense of carrying a firearm on his person without a permit or license to do so, in violation of HRS § 134-9 (1976). At issue is whether the trial court erred in denying the defendant's motion to suppress a handgun seized from his person.

Federal Agent Bryant Carvalho testified that on October 13, 1978, at approximately 10:00 a.m., he received a telephone call from an informant whom he personally knew and who had provided him with reliable information in the past. For his protection the informant's identity was not revealed at the hearing. The tip which the officer received was to the effect that Jeff Kealoha and another person named "Mike" were on their way to the IBEW Union Hall on Hau Street in a late model Cutlass automobile bearing license number 6C87; that they were the two individuals who had been in an altercation earlier with union leader, Josiah Lii; that they had three machine guns in the trunk of their car; and that they were probably carrying firearms on their persons. How and in what manner the informant obtained this information is not shown by the record. Upon receipt of this information, Agent Carvalho immediately informed Federal Agents William Muese, Robert Greenleaf, and Barry Caires that a possible federal violation was in progress. The officers thereupon drove to the vicinity of the union hall where they set up a surveillance of the area.

At approximately 10:45 a.m. Agent Greenleaf saw the car described by the informant moving along Hau Street and into the IBEW parking lot. After parking their vehicle, the two men who were in the car stepped out and Agent Greenleaf recognized one of them to be Jeff Kealoha. There was nothing unusual or suspicious about Kealoha's appearance or behavior. The agent noticed, however, that the other man, the

defendant, had a bulge under his shirt at the right hip area. Agents Greenleaf and Muese drove into the parking lot and as they approached the two men, the officers saw the defendant looking at them while appearing to adjust the bulge under his shirt. The agents came to a stop near the two and alighted from their vehicle with guns drawn. They ordered Kealoha and the defendant to place their hands against the car and conducted a frisk of their persons. The object causing the bulge under the defendant's shirt was revealed by the search to be a revolver. Agent Carvalho meanwhile had arrived at the scene and asked the defendant for permission to look inside the car. The defendant gave him the keys and the subsequent search revealed a Radum firearm loaded with nine rounds. These were contained in a closed paper sack in an airlines travel bag. The car trunk was then opened and searched, but no other firearms were found.

The defendant argues that the agents' frisk of his person was without legal justification. This argument is without merit. A law enforcement officer may "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *State v. Barnes*, 58 Haw. 333, 337, 568 P.2d 1207, 1211 (1977). And while we agree with the defendant's contention that the reliability of the tipster's information was not sufficiently established as a basis for an arrest on probable cause, *see Aguilar v. Texas*, 378 U.S. 108 (1964), it was sufficiently corroborated by the officers' observations to warrant a limited investigatory stop.

Here, the informant was personally known to Agent Carvalho and, according to the latter, had given the officer reliable information in the past. The substance of his tip was very specific and was adequately anchored as to time and place. *See State v. Kea*, 61 Haw. 566, 606 P.2d 1329 (1980). *Compare, State v. Joao*, 55 Haw. 601, 525 P.2d 580 (1974). Moreover, the agents acted promptly upon the information and their observations coincided in verifiable respects with their informant's tip. *See Id.* Particularly because firearms were allegedly involved, it was incumbent upon them, at the very least, to

conduct some investigation to ascertain whether a crime had been committed or was being committed by the occupants of the vehicle. *State v. Kea, supra; State v. Goudy*, 52 Haw. 497, 479 P.2d 800 (1971). This, however, does not end our inquiry.

A right to stop does not automatically confer upon the officer the right to frisk the person stopped. *Sibron v. New York*, 392 U.S. 40, 64 (1968). "[A] search and seizure in a stop and frisk situation is justified only if from the specific conduct of the defendant, or from reliable information, or from the attendant circumstances, the officer may reasonably infer that the person stopped is armed and presently dangerous." *State v. Barnes, supra*, at 338, 568 P.2d at 1212.

Applying this rule to the facts of this case, we find that the frisk of the defendant was not improper. The occupants of the vehicle were suspected of being in possession of firearms. When they emerged from their automobile, the defendant was observed with a bulge under his shirt in an area where a handgun has been known to be carried. Trained and experienced in these matters, the agents could have reasonably inferred that the bulge was made by a small firearm. Agent Greenleaf did indeed believe that the bulge was a gun, and the defendant's movements concerning the hidden object were consistent with this possibility. Agent Greenleaf testified:

Q. Now, you testified that Mr. Ward put his hand by the right hip area to position the bulge. What do you mean by that?

A. Well, when he got out of the car, he first kind of pulled his shirt down and then kind of made a movement. Now, when I recovered the firearm, it was not in a holster. And from past experiences, I can state that when you don't wear a holster and you have a gun stuck in your pants, it tends to slide around and move.

\* \* \* \*

A. And when you get out of the vehicle or do something where your body has to move, you certainly have to position the gun to keep it from falling down or out. This was the type of movement I saw.

In these circumstances, the agents were entitled to con-

duct a limited protective search for concealed weapons.[1] *Adams v. Williams,* 407 U.S. 143 (1972). As the Supreme Court has pointed out, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry v. Ohio, supra,* at 24.

Affirmed.

*Peter C. Wolff, Jr. (Hart, Leavitt & Hunt,* of counsel) for defendant-appellant.

*Arthur Ross,* Deputy Prosecuting Attorney for plaintiff-appellee.

---

[1] Regarding the search itself, Agent Greenleaf testified:

We drove up, got out, identified ourselves; and I asked both men to place their hands on the hood of the car due to the observations I had seen Michael [the defendant] make. At that time, Michael reached with his right hand to his right waist area, and I told him again to place his hands on the car, and he again was reaching for that area when I grabbed him and put him on the car. I patted him down and found a revolver concealed under his shirt in his right waist area. I removed the revolver, found it was loaded, and then told him to stay right where he was.