111 P.3d 39

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Reynaldo UGALINO, Defendant–Appellant.**

**No. 25545.**

Intermediate Court of Appeals of Hawai'i.

March 24, 2005.

As Amended April 8, 2005.

Certiorari Denied May 5, 2005.

Phyllis J. Hironaka, Deputy Public Defender, on the briefs, for Defendant–Appellant.

Peter A. Hanano (Arleen Y. Watanabe on the answering brief), Deputy Prosecuting Attorneys, County of Maui, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Reynaldo Ugalino (Ugalino) appeals from the Judgment entered on November 20, 2002, by the Circuit Court of the Second Circuit (circuit court).[1]

---

1. The Honorable Rhonda I.L. Loo presided over the hearings on the motion of Defendant–Appel-

A jury found Ugalino guilty of possessing at least one-eighth ounce of methamphetamine (Count 1); possessing drug paraphernalia in the form of plastic packets or a folded paper scooper (Count 2); attempting to distribute at least one-eighth ounce of methamphetamine (Count 3); assaulting a police officer (Count 4); and resisting arrest (Count 5). The circuit court sentenced Ugalino to concurrent terms of imprisonment of ten years on Count 1, five years on Count 2, twenty years on Count 3, one year on Count 4, and one year on Count 5. It imposed mandatory minimum jail terms of two years on Count 1 and three years on Count 3.

On appeal, Ugalino contends that the circuit court erred in denying his motion to suppress evidence. He further claims that his conviction on Count 3 for attempting to distribute at least one-eighth ounce of methamphetamine should be reversed or vacated because 1) Count 3 of the indictment was defective; 2) the circuit court's jury instruction constructively amended Count 3; and 3) there was insufficient evidence to prove the attempted distribution offense. We reject Ugalino's suppression of evidence claim but agree that there was insufficient evidence to support his conviction on Count 3. We therefore affirm the Judgment as to Counts 1, 2, 4, and 5, and reverse Ugalino's conviction on Count 3.

## I. UGALINO'S SUPPRESSION OF EVIDENCE CLAIM

### A. The Suppression Hearing Evidence

Ugalino moved to suppress evidence recovered by the Maui Police Department (MPD). MPD Officers Dana Wingad and Bradney Hickle testified at the suppression hearings. The officers' testimony, which the circuit court found was credible, established the following sequence of events.

On September 28, 2001, MPD Officers Wingad, Hickle, and Anthony Krau were involved in executing two bench warrants for Ugalino's girlfriend. The warrants were based on indictments charging the girlfriend

with numerous felony drug offenses, including a class A felony for Promoting a Dangerous Drug in the First Degree. Bail of $100,000 was set for each warrant. The officers went to execute the warrants at a residence where Ugalino and his girlfriend lived.

The officers were in uniform when they walked up to the residence. Through an open garage door, Officers Wingad and Hickle saw Ugalino standing in the middle of the garage and two other men behind a tool rack in the back of the garage. Officer Wingad announced that he had a bench warrant for Ugalino's girlfriend. Ugalino turned toward the officers and appeared startled by their presence. He immediately raised his left hand in front of him and concealed his right hand behind his back. Ugalino's unusual stance made it look like he was about to draw or pull something from behind his back. Officers Wingad and Hickle suspected that Ugalino was hiding a gun or other weapon behind his back and believed that Ugalino posed a threat to their safety. The officers' safety concerns were heightened by the knowledge that they were serving warrants for serious drug offenses and that drug dealers are frequently armed with guns and prone to engage in violence. The execution of the warrants at a residence also increased the danger that someone close to the wanted individual might intervene.

Officers Wingad and Hickle drew their guns and instructed Ugalino to show his hands. Ugalino refused, keeping his right hand concealed behind his back. The two men behind the tool rack also ignored the officers' requests that the men come out and show their hands. In the midst of this standoff, Officer Wingad saw Ugalino's girlfriend in the house. Officer Wingad told the girlfriend that he had bench warrants for her arrest and asked her to come out. The girlfriend complied and the two men behind the tool rack also came out and sat on the garage floor. While this was occurring, Officers Wingad and Hickle saw Ugalino turn, put his right hand into his right front pocket, and then raise both hands.

lant Reynaldo Ugalino (Ugalino) to suppress evidence and the Honorable Joel E. August presided over Ugalino's trial.

Officer Hickle observed a bulge in Ugalino's right front pocket. Because of this bulge and Ugalino's earlier refusal to show the hand hidden behind his back, Officer Hickle believed that Ugalino may have a concealed weapon. Officer Hickle approached Ugalino and advised him, "You are not being placed under arrest. I just need to pat you down for [a] weapon." Officer Hickle started to pat down Ugalino, but Ugalino pulled away and vigorously resisted especially when Officer Hickle got near Ugalino's right front pocket. Ugalino's resistance reinforced Officer Hickle's suspicion that Ugalino was concealing a weapon. Ugalino kept struggling to prevent Officer Hickle from completing the pat-down search despite Officer Hickle's repeated assurances that Ugalino was not being arrested and that the pat-down search was only to make sure that Ugalino did not have a weapon. Officer Wingad went to help Officer Hickle, but both officers were unable to control Ugalino.

Officer Wingad decided to escort Ugalino outside the small garage because it was crowded with people and tools were accessible. Ugalino swung his arms to get away from the officers. Officer Wingad eventually escorted Ugalino out of the garage and told Ugalino to put his hands on a nearby trailer so that Officer Wingad could pat Ugalino down. Ugalino continued to guard his right front pocket and then tried to jump over the trailer. Officer Wingad grabbed Ugalino, and Ugalino kicked Officer Wingad in the left shin, causing a sharp pain. At that point, Officer Wingad advised Ugalino that he was under arrest for assaulting a police officer.

Officer Wingad subdued Ugalino, put Ugalino in a patrol car, and searched him incident to the arrest. In Ugalino's right front pocket, Officer Wingad found, among other things, a plastic bag containing crystal methamphetamine weighing approximately 19 grams (gross weight), empty ziplock packets, and $1,551 in cash. Officer Wingad also recovered a glass smoking pipe in plain view on a table in the garage.

## B. The Circuit Court Properly Denied Ugalino's Motion to Suppress Evidence.

After hearing the evidence, the circuit court orally denied Ugalino's motion to suppress. The court specifically found that the officers' testimony, especially that of Officer Hickle, was credible and adopted the officers' version of events in its detailed oral findings of fact. The court directed the State of Hawai'i (the State) to prepare the written order. On September 13, 2002, the circuit court filed its "Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Suppress Evidence" (Suppression Order).[2]

---

2. The "Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Suppress Evidence" state in pertinent part as follows:

*FINDINGS OF FACT*

1. On September 28, 2001, Maui Police Department officers went to 114 A Keala Street, Kihei, for the purpose of executing two felony *arrest warrants* totaling $200,000, on [Ugalino's] girlfriend].

2. When Officers arrived at the location they observed an open attached garage with at least three individuals within. At this time the police officers were attempting to locate [Ugalino's girlfriend]. Upon police approaching the garage, Reynaldo Ugalino (hereinafter "Defendant") was startled by the police presence. Defendant suddenly raised his left hand in the air, and tucked his left [sic] arm behind his back, as if to conceal something. Two other males were observed hiding behind a tool rack to the rear of Defendant.

3. For officer safety, all three men [sic] to raise there [sic] hands. The males including Defendant refused to raise there [sic] hands, and Defendant backed away from the officers.

4. After the individuals continued to refuse the police demands, Officer Dana Wingad drew his firearm and continued to instruct the individuals to raise there [sic] hands.

5. [Ugalino's girlfriend] was observed through a window in the garage. Officer Wingad instructed [Ugalino's girlfriend] regarding the arrest warrant, and ordered her to step outside of the residence.

6. The Defendant, was again, ordered to raise his hands in the air. Which again, resulted in negative compliance. Defendant was then observed to slide his right hand into his right side pocket, and then place his hand in the air. The two males then came from behind the tool rack and placed their hands in air.

7. [Ugalino's girlfriend] *exited the residence* and was placed under arrest. At this time a strong odor of marijuana was coming from the residence.

8. The police officers then attempted to pat down Defendant for officer safety reasons, where Defendant refused to comply.

In the Suppression Order, the circuit court determined that based on Ugalino's conduct and the attendant circumstances, it was reasonable for the officers to infer that Ugalino was armed and presently dangerous. The circuit court concluded that the officers' attempts to pat down Ugalino had progressed far enough to constitute a frisk. It further concluded that the officers were justified in temporarily detaining Ugalino and frisking him for weapons. The circuit court noted, among other things, that the officers, upon entering the premises, had observed Ugalino and two other males making furtive movements, that Ugalino appeared to conceal something behind his back, that Ugalino refused to comply with the officers' requests to raise his hands, and that the officers knew that Ugalino's girlfriend was being arrested for felony offenses.

We review the trial court's findings of fact under the clearly erroneous standard, *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994), and its conclusions of law *de novo*. *State v. Eleneki*, 92 Hawai'i 562, 564, 993 P.2d 1191, 1193 (2000). We review a ruling on a motion to suppress evidence *de novo*. *State v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997).

The issue in Ugalino's appeal is whether the police officers were required to have a reasonable suspicion that Ugalino both possessed a weapon *and* was involved in criminal activity before the officers could temporarily detain him and pat him down for weapons. While Ugalino does not dispute the officers' reasonable belief that he was armed and dangerous, Ugalino claims that "there were

9. The officers continuously tried to have Defendant comply with their orders, however, Defendant continued to refuse.

10. Officers then attempted to pull Defendant out of the garage, away from numerous tools and away from the two other males within close proximity.

11. Once outside of the garage, the police attempted on several occasions to have Defendant cooperate with a pat-down search, however, Defendant continuously refused the pat-down search. Finally, during an attempt to conduct a pat-down search by Officer Dana Wingad, Defendant kicked Officer Wingad in the shin area, causing a sharp pain.

12. Defendant was then informed that he was being placed under arrest.

13. Defendant was the [sic] subdued by the police and placed into handcuffs. Officer Wingad then searched Defendant's pockets as a search incident to arrest, and recovered $1,551.00, a large ziplock bag containing 19.08 grams of methamphetamine, two packets with methamphetamine residue, and eight small ziplock bags.

### CONCLUSIONS OF LAW

1. A law enforcement officer may "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *State v. Ward*, 62 Haw. 459, 617 P.2d 565 (1980) citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. Where an officer is in possession of information, where he can point to specific and articulable facts which would warrant a man of reasonable caution to believe that criminal activity involving the suspect is afoot, the officer is authorized to make a temporary investigative stop. *State v. Madamba*, 62 Haw. 453, 617 P.2d 76 (1980).

3. The Maui police officers possessed judicial authority to enter onto the premises of 114 A Keala Street in Kihei, to make an arrest of [Ugalino's girlfriend]. After the police made a valid entry of the premises, they discovered defendant and two other males making furtive movements to cause grave concern to the officers [sic] safety.

4. Taking into account the officers' knowledge of the felony arrest of [Ugalino's girlfriend], and the dangerous actions of Defendant a reasonable person would suspect that a pat-down search was appropriate police action.

6 [sic]. The search and seizure, and subsequent frisk was justified, based on the specific conduct of the defendant, and from the attendant circumstances, that the officers may reasonably have infered [sic] that the person stopped is armed and presently dangerous. *State v. Barnes*, 58 Haw. 333, 568 P.2d 1207 (1977), citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

6. Here, the Maui Police officers had specific conduct of the Defendant to warrant a frisk. First, Officer Wingad observed the Defendant and two other individuals being startled by the police presence. Defendant suddenly raised his left hand in the air, and tucked his left [sic] arm behind his back, as if to conceal something. Two other males were observed hiding behind a tool rack to the rear of Defendant. For officer safety, and the fear that Defendant was possibly concealing a weapon, officers instructed all three men to raise there [sic] hands. The males including Defendant refused to raise there [sic] hands, and Defendant was backing away from officers. As such the subsequent pat-down of defendant was permissible.

### ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, Defendant's Motion to Suppress Evidence is denied.

no facts from which they could reasonably conclude that he was involved in any criminal activity." On this basis, Ugalino challenges the circuit court's conclusion that the officers acted lawfully in detaining him and frisking him for weapons, claiming instead that the officers violated his rights under the Fourth Amendment to the United States Constitution (Fourth Amendment) and Article I, Section 7 of the Hawai'i Constitution (Article I, Section 7).

### 1. The Officers Were Justified in Detaining Ugalino and Conducting a Pat–Down Search for Weapons.

■ The Fourth Amendment provides in relevant part that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .

Article I, Section 7 provides in relevant part that:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated. . . .

The protections of the Article I, Section 7 may be extended beyond those available under the Fourth Amendment when warranted by logic and a sound regard for purposes of those protections. *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974).

We conclude that under the circumstances of this case, the officers were justified in detaining Ugalino and conducting a pat-down search for weapons. We hold that when police officers encounter someone while lawfully at a residence to execute an arrest warrant, the officers may detain that person and perform a pat-down search for weapons if the officers have a reasonable and articulable basis to suspect that the person may possess a weapon and pose a danger. The officers may compel such person to submit to a pat-down search for weapons even if the officers have no reasonable suspicion that the person is involved in criminal activity. Police officers should not be forced to assume unreasonable risks and gamble with their safety

while executing an arrest warrant at a residence.

#### a. The *Terry v. Ohio* balancing test

The Fourth Amendment and Article I, Section 7 do not proscribe all searches and seizures, but only those that are unreasonable. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court established the analytical framework for evaluating the reasonableness of a search or seizure by the police under the Fourth Amendment. The Hawai'i Supreme Court has applied the standards set forth in *Terry* in determining whether police conduct complied with Article I, Section 7. *State v. Bohannon,* 102 Hawai'i 228, 237, 74 P.3d 980, 989 (2003); *State v. Ward,* 62 Haw. 459, 461–63, 617 P.2d 565, 566–67 (1980).

■ The assessment of reasonableness, the United States Supreme Court held in *Terry,* requires a balancing of the governmental interest which allegedly justifies the police action against the resulting invasion of the individual's constitutionally protected interests. *Terry,* 392 U.S. at 20–21, 88 S.Ct. 1868. The police must be able to point to specific and articulable facts which reasonably warrant the intrusion. *Id.* at 21, 88 S.Ct. 1868. The standard is an objective one: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. 1868.

In *Terry,* the Court applied the balancing test to an on-the-street encounter between a police officer and three men the officer suspected were planning a robbery. After observing the men engage in conduct the officer believed amounted to "casing" a store in preparation for a robbery, the officer detained the men for questioning and frisked them for weapons. *Id.* at 6–7, 88 S.Ct. 1868. A gun recovered from the petitioner Terry was used to prosecute him for carrying a concealed weapon. *Id.* at 8, 88 S.Ct. 1868. While recognizing that an investigative stop and frisk constituted a severe, though brief, intrusion on Terry's personal security, the Court held that when balanced against the governmental interests, the police officer's

conduct was reasonable and therefore permissible under the Fourth Amendment. *Id.* at 24–25, 30–31, 88 S.Ct. 1868.

The Court first concluded that the governmental interest in effective crime prevention and detection justified the officer's detention of Terry and his companions for further questioning. *Id.* at 22–23, 88 S.Ct. 1868. In light of the men's behavior, "[i]t would have been poor police work indeed" for the officer to have failed to investigate further. *Id.* at 23, 88 S.Ct. 1868. The officer's frisk of Terry for weapons was additionally justified by the governmental interest in allowing a police officer to take "steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against" the officer. *Id.* The Court determined that it would be "unreasonable to require that police officers take unnecessary risks in the performance of their duties" or to deny an officer "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 23–24, 88 S.Ct. 1868. The Court concluded:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Id.* at 27, 88 S.Ct. 1868.

The Court held that under the particular circumstances of the case, the frisk of Terry had been a reasonable search under the Fourth Amendment and that the gun recovered from him was properly admitted in evidence. *Id.* at 30–31, 88 S.Ct. 1868.

> Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868.

### b. Applying the *Terry v. Ohio* balancing test

■ *Terry* requires that a frisk for weapons made pursuant to an investigative detention be based on reasonable suspicion that the person frisked is both involved in criminal activity and poses a danger. Where a frisk for weapons is done pursuant to an investigative detention, it makes sense to require reasonable suspicion that the person frisked is involved in criminal activity. Such a requirement is necessary to ensure that the police are engaged in a lawful investigation and that their pre-frisk encounter with the person was lawful. Moreover, it is the officer's act of detaining the person that typically exposes the officer to danger. Without requiring reasonable suspicion that the person is involved in criminal activity, the police could use their own unlawful conduct in detaining the person for investigation to create a justification for frisking that person for weapons.

The situation is different where police officers are executing an arrest warrant at a residence and someone who is not the subject of the warrant exposes the officers to danger. In this circumstance, the officers encounter the person posing the danger in the course of lawfully performing their official duties. In addition, the danger is not created by the officers' act of detaining the person for investigation. The MPD officers

were lawfully at Ugalino's residence to execute arrest warrants for Ugalino's girlfriend when they encountered Ugalino in the garage. The officers justifiably feared that if they left Ugalino alone and did not frisk him for weapons, Ugalino would attack them with a concealed weapon to prevent the arrest of his girlfriend. Accordingly, in the circumstances presented by Ugalino's case, the requirement that the officers have a reasonable suspicion that the person frisked is involved in criminal activity is not necessary to ensure that the officers' pre-frisk encounter was lawful or to prevent the officers from using their own unlawful conduct to justify the frisk. The rationale for requiring reasonable suspicion of criminal activity when the frisk is pursuant to an investigative detention does not apply when the frisk is to protect the safety of officers executing an arrest warrant at a residence.

The criminal activity requirement in *Terry* applies to on-the-street investigative detentions and was not intended to govern all police encounters. The Court in *Terry* emphasized that each case would have to be decided on its own facts. *Id.* at 30, 88 S.Ct. 1868. Since *Terry*, the United States Supreme Court has upheld reasonable steps taken by the police to assure their safety under the Fourth Amendment in the context of the execution of an arrest warrant at a residence. In *Maryland v. Buie*, 494 U.S. 325, 334–37, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Court held that after apprehending the person named in the arrest warrant, police officers may conduct a protective sweep of the residence to search for other individuals beyond spaces immediately adjoining the place of arrest. The officers are authorized to conduct such a protective sweep if they have a reasonable suspicion that the residence harbors other individuals posing a danger to the officers. *Id.* at 334, 110 S.Ct. 1093. The Court did not require a reasonable suspicion that these other individuals are involved in criminal activity.

The aspect of *Terry* that the Court has consistently applied to other kinds of police encounters is the balancing test for measuring the reasonableness of a search or seizure

under the Fourth Amendment. It is to this balancing test that we now turn.

Compelling a person to submit to a pat-down search for weapons is unquestionably a serious intrusion on an individual's personal security. *Terry*, 392 U.S. at 24–25, 88 S.Ct. 1868. The temporary detention of the person is a necessary component of the pat-down search for weapons. A person is not free to leave until the pat-down search is completed, nor is the person free to resist the search. Nevertheless, a pat-down search is brief and is limited to a search of the outer clothing for weapons. It is significantly less intrusive than a full-blown search of a person or premises for evidence. Moreover, a person present at a residence during the execution of an arrest warrant can avoid the need for a pat-down search by providing the officers with reasonable assurance that he or she is not armed.

On the other side of the balance is the government's compelling interest in allowing police officers to take reasonable steps to protect themselves in performing their duties. The danger to police officers executing an arrest warrant at a residence is as great as, if not greater than, the risk presented in a *Terry*, on-the-street investigative encounter. *Maryland v. Buie*, 494 U.S. at 333, 110 S.Ct. 1093. A residential arrest puts the officers at the disadvantage of being on unfamiliar "turf" in a volatile situation. *Id.* The people present will likely be sympathetic toward and protective of the person being arrested. Often, the officers will have no information about anyone besides the individual named in the warrant and thus little basis for determining whether other people present are involved in criminal activity. Yet, if the others present are armed with guns or other weapons, they pose an obvious threat to the safety of the officers. This threat persists regardless of whether the officers have a basis for believing that these people are involved in criminal activity.

In circumstances analogous to Ugalino's case, courts from other jurisdictions have upheld frisks for weapons and temporary detentions for officer safety without requiring individualized proof that the person was involved in criminal activity. In *State v.*

*Mann,* 271 Conn. 300, 857 A.2d 329, 333 (2004), the police received information of drug activity at an apartment. The police knocked on the apartment door, which the defendant opened. *Id.* Upon seeing the police, the defendant attempted to close the door with his left hand and simultaneously reached his right hand into his right pocket. *Id.* at 333, 345. In response, Officer Rubino drew his gun, entered the apartment, placed the defendant against a wall, and conducted a pat-down search for weapons. *Id.* at 333. During the pat-down search, Officer Rubino felt what he believed were drugs in the defendant's right pocket, which were seized and used to prosecute the defendant. *Id.*

The Connecticut Supreme Court held that Officer Rubino had acted in a constitutionally permissible fashion in conducting the pat-down search because the "overwhelming" interest in promoting police safety outweighed the intrusion into the defendant's privacy. *Id.* at 340–41. The court acknowledged that although the police had a reasonable basis to suspect that the apartment was the site of illicit drug trafficking, "they had no reason to suspect, in contrast to the officer in *Terry,* that any particular individual was involved in the suspected illegal activity." *Id.* at 342 n. 17. The court determined that reasonable suspicion that the defendant was involved in criminal activity was not necessary to justify the pat-down search because, as in *Terry,* the officers' initial encounter with the defendant was lawful. *Id.* The court stated that the crux of *Terry* was whether the officer's intrusion was reasonably justified by the need for self-protection. *Id.* The court concluded:

> Thus, as a general matter, it would be unreasonable to conclude that the fourth amendment bars an officer from patting down a person for weapons, if the officer has a reasonable and articulable suspicion that that person is armed and potentially dangerous, whenever, in the discharge of his official duties, the officer lawfully encounters such a person. In other words, as long as the officer reasonably suspects that a person whom he has lawfully encountered is armed and dangerous, the

officer's interest in conducting a limited patdown search for weapons will outweigh that individual's privacy interest in being free from that intrusion.

*Id.*

In *United States v. Maddox,* 388 F.3d 1356, 1358–59 (10th Cir.2004), two federal marshals and a local deputy sheriff went to a mobile home to execute an arrest warrant on Rachel Page for narcotics trafficking. While the marshals were inside the residence serving the warrant, the deputy sheriff detained a group of people in the outside carport, including defendant Maddox who had pulled into the driveway while the warrant was being served. *Id.* at 1359–61. Maddox's erratic behavior caused the deputy sheriff to believe that Maddox posed a danger. *Id.* at 1360. Maddox was separated from the others and disclosed during questioning that he was carrying a concealed gun and methamphetamine, which were recovered and used to prosecute him. *Id.*

On appeal, the Tenth Circuit rejected Maddox's claim that his detention in the carport had been an unconstitutional seizure. The court held that law enforcement officers executing an arrest warrant at a residence may detain individuals at the scene of the arrest if the officers have a reasonable and articulable suspicion that the individuals pose a danger to the officers. *Id.* at 1365. The court concluded that under this standard, the deputy sheriff's "protective" detention of Maddox on the ground of officer safety was justified and did not violate the Fourth Amendment. *Id.* at 1365–66.[3]

█ In Ugalino's case, the MPD officers were lawfully at Ugalino's residence to execute bench warrants for his girlfriend. As the officers approached the residence, they encountered Ugalino, who immediately concealed his right hand behind his back, and two unknown men partially hidden behind a tool rack. Ugalino refused the officers' repeated requests to show his right hand. Ugalino then slipped something from his right hand into his pocket, leaving a visible

---

**3.** *See also El–Amin v. Commonwealth,* 269 Va. 15, 607 S.E.2d 115 (2005) (holding that upon discovering that one member of a group possessed a weapon, the police were justified, based on concern for their safety, in patting down other members of the group for weapons).

bulge in that pocket. Ugalino's unusual conduct gave the officers a reasonable and articulable basis for suspecting that Ugalino possessed a weapon and posed a danger to them. In addition, the officers knew that they were executing warrants for serious drug offenses, that guns and the use of violence are often associated with drug crimes, and that Ugalino might have a desire to prevent his girlfriend's arrest.

Even if the officers lacked a reasonable suspicion that Ugalino was involved in criminal activity, they were justified in fearing that Ugalino would use a concealed weapon against them if they did not temporarily detain him and perform a pat-down search for weapons. Officer Wingad testified that he wanted to pat Ugalino down for weapons due to concern that Ugalino might pull out a gun and shoot the officers as they escorted Ugalino's girlfriend from the premises.

■ Balancing the government's legitimate and weighty interest in protecting the safety of police officers against the intrusion to Ugalino's privacy interests, we conclude that it was reasonable and therefore permissible under the Fourth Amendment and Article I, Section 7 for the officers to detain Ugalino and to perform or attempt to perform a pat-down search for weapons. We hold that police officers lawfully at a residence to execute an arrest warrant are justified in performing a pat-down search for weapons on any person whom the officers reasonably suspect may possess a weapon and pose a danger to the officers.[4] Reasonable suspicion that the person is involved in criminal activity is not required. The officers' authority to conduct a pat-down search for weapons necessarily includes the authority to temporarily detain the person to perform the pat-down search. Otherwise, the authority to conduct a pat-down search would be illusory; the person could avoid the pat-down search simply by refusing or resisting the officers' attempts. The length of the detention and the scope of the pat-down search, however, must not exceed what is necessary to protect the safety of the officers.

## 2. Ugalino Was Not Subject to a *De Facto* Arrest.

■ Having determined that the officers lawfully detained Ugalino to conduct a pat-down search for weapons, we now address Ugalino's claim that he was subject to a *de facto* arrest not supported by probable cause. Ugalino argues that from the moment the officers drew their weapons, he was subject to a *de facto* arrest rather than a temporary detention. He asserts that the officers' conduct in directing him to show his hands and submit to a pat-down search for weapons further demonstrates that he was under *de facto* arrest. Ugalino's arguments are without merit.

■ The determination of whether a detention has turned into a *de facto* arrest requires an objective assessment of the totality of the circumstances. *State v. Ketchum,* 97 Hawai'i 107, 125–26, 34 P.3d 1006, 1024–25 (2001) (discussing *de facto* arrest in the context of custody for *Miranda* purposes). A detention has morphed into an arrest where "an innocent person could reasonably have believed that he or she was not free to go and that he or she was being taken into custody indefinitely." *Id.* at 125, 34 P.3d at 1024 (quoting, *Kraus v. County of Pierce,* 793 F.2d 1105, 1109 (9th Cir.1986) (quotation marks and brackets omitted)).

■ Where the defendant's claim of *de facto* arrest is based on the aggressiveness of the methods used by the police, the court must consider both the intrusiveness of the detention and the justification for the police tactics. *United States v. Rousseau,* 257 F.3d 925, 929 (9th Cir.2001). In determining whether a detention has turned into a *de facto* arrest, the court must not only evaluate how intrusive the detention was, but "whether the methods used [by the police] were reasonable *given the specific circumstances." Id.* (Emphasis in original). Both the United States Supreme Court and the

---

**4.** The person named in the arrest warrant, of course, can be taken into custody and searched incident to his or her arrest.

Hawai'i Supreme Court have held that police officers are entitled to take steps reasonably necessary to protect their personal safety without converting a temporary detention into an arrest. *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *State v. Goudy*, 52 Haw. 497, 502–04, 479 P.2d 800, 803–04 (1971). These reasonable steps include the use of force. *United States v. Buffington*, 815 F.2d 1292, 1300–01 (9th Cir.1987).

An objective assessment of the totality of the circumstances demonstrates that Ugalino was not subjected to a *de facto* arrest. In particular, the officers' use or display of force was reasonably necessary to protect their personal safety and was in response to Ugalino's erratic and hostile behavior. As Officer Wingad approached the garage, he announced that he was there to execute a bench warrant for Ugalino's girlfriend. Ugalino reacted by immediately concealing his right hand behind his back and assuming a "gunfighter's" stance [5] that made it appear that he was about to draw a weapon from behind his back. The officers justifiably responded by drawing their guns and repeatedly instructing Ugalino to show his hands. Ugalino not only refused to show his right hand, but slipped something from that hand into his pocket which left a discernible bulge. Ugalino's conduct made it reasonable for the officers to insist that Ugalino submit to a pat-down search for weapons.

Officer Hickle specifically and repeatedly advised Ugalino that he was not under arrest and that Officer Hickle simply wanted to pat him down for weapons. Thus, Officer Hickle took affirmative steps to assure Ugalino that his detention would be temporary and limited to a pat-down search for weapons. Nevertheless, Ugalino aggressively resisted the officers' attempts to pat him down. Ugalino repeatedly pulled away from the officers and struggled to prevent them from completing the pat-down search. In light of this behavior, Officer Wingad acted reasonably in moving Ugalino a short distance outside the crowded garage to perform the pat-down search. It was Ugalino's own conduct that prolonged his detention and required the officers to use greater force. *See United States v. Sharpe*, 470 U.S. 675, 687–88, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (holding that a 20–minute detention was not a *de facto* arrest when the detainee's own actions contributed to the delay).

"[A]n innocent person" in Ugalino's position would reasonably have believed that he was being detained temporarily for a weapons frisk and not that he "was being taken into custody indefinitely." *Ketchum*, 97 Hawai'i at 125, 34 P.3d at 1024. Under analogous circumstances, courts have rejected defendants' claims that their detentions had been converted into *de facto* arrests. *E.g.*, *Goudy*, 52 Haw. at 502–04, 479 P.2d at 803–04 (holding that police officers' approach of suspects with drawn pistols was a reasonable self-protection measure and did not convert an investigative detention into an arrest); *United States v. Buffington*, 815 F.2d at 1295, 1300 (holding that the fact that the police stopped the defendants' car, ordered defendants out of the car at gunpoint, and forced them to lie face down on the pavement did not turn the stop into an arrest); *Halvorsen v. Baird*, 146 F.3d 680, 683, 685 (9th Cir.1998) (holding that handcuffing a person and moving him three blocks for questioning did not automatically turn a detention into an arrest when such actions were justified by reasons of officer safety and security). We conclude that Ugalino was not subject to a *de facto* arrest at any time prior to his formal arrest for assaulting Officer Wingad.[6]

---

5. Officer Bradney Hickle described Ugalino's stance as like "the O.K. Corral."

6. Ugalino's reliance on *State v. Ketchum*, 97 Hawai'i 107, 34 P.3d 1006 (2001), to show that he was under *de facto* arrest is misplaced. In *Ketchum*, the police found that the defendant was in custody for *Miranda* purposes where he was aware that numerous police officers had forced open the front door and were securing the apartment's occupants; the police had found the defendant in a bedroom with Donna Mae Wright (Wright) and had ordered both to show their hands; and while one officer was serving the search warrant on Wright and another officer was photographing both the defendant and Wright, a third officer asked the defendant a question likely to elicit an incriminating response. *Ketchum*, 97 Hawai'i at 111–12, 127, 34 P.3d at 1010–11, 1026. Unlike in *Ketchum*, Ugalino was advised from the outset that the officers' presence was not related to his activi-

### 3. Ugalino's Remaining Suppression Claims Lack Merit.

 In his points of error on appeal, Ugalino identifies a number of the circuit court's written factual findings which he claims were clearly erroneous. He does not, however, explain why any of the alleged erroneous factual findings warrant our overturning the circuit court's suppression ruling. We conclude that any errors in the circuit court's factual findings were insubstantial and do not affect the validity of the court's denial of Ugalino's motion to suppress evidence.[7]

Ugalino claims that the circuit court erred in not specifically ruling on whether a butane lighter and a glass pipe, which were admitted at trial, should have been suppressed. He also argues that the court should have suppressed Officer Wingad's trial testimony that he observed chemicals and items that could be used in a clandestine methamphetamine laboratory. The court sufficiently ruled on the admissibility of the butane lighter and the glass pipe by denying Ugalino's motion to suppress evidence. The record fully supports the court's refusal to suppress these items. The butane lighter was recovered from the same pocket as the methamphetamine and ziplock packets that the court ruled were lawfully seized. The glass pipe was seen in plain view on a table in the garage and thus properly seized. In its Suppression Order, the circuit court concluded that the officers had made a valid entry on the premises to execute arrest warrants. Since Officer Wingad was lawfully on the premises when he observed the chemicals and other items, we see no basis for suppressing his observations.

Ugalino contends that the officers, according to their suppression hearing testimony, drew their guns in response to Ugalino concealing his right arm behind his back in a "cowboy" stance, and not after Ugalino and the two men in the garage refused to show their hands. Officer Wingad, however, testified at trial that he drew his gun after Ugalino and the other men refused to comply with his instructions to raise their hands. Whether Officer Wingad drew his gun after Ugalino hid his arm behind his back or after Ugalino and the two men refused to show their hands does not affect the validity of the circuit court's ruling.

FOF # 7 [Ugalino's girlfriend] exited the residence and was placed under arrest. *At this time a strong odor of marihuana was coming from the residence.*

The State of Hawai'i (the State) concedes that there was no evidence regarding a strong odor of marihuana. The circuit court, however, did not base its ruling on this finding which was irrelevant.

FOF # 13 ... Officer Wingad then searched Defendant's pockets as *a search incident to arrest,* and recovered $1,551.00, a large ziplock bag containing *19.08 grams* of methamphetamine, two packets with methamphetamine residue, and eight small ziplock bags.

The circuit court's determination that Officer Wingad searched Ugalino incident to arrest was proper. The finding as to the weight of the methamphetamine was supported by Officer Wingad's testimony that the gross weight of the methamphetamine (which includes the packaging material) was 19.08 grams.

---

ties, but that the officers were only there to execute arrest warrants for his girlfriend. In addition, Ugalino was specifically told that he was not under arrest and that his detention was solely to permit the officers to pat him down for weapons. Moreover, unlike in *Ketchum,* the officers' display of force was in response to Ugalino's behavior. Accordingly, *Ketchum* is distinguishable and does not control Ugalino's case.

7. Ugalino complains that the underlined portions of the following findings of fact (FOF) were clearly erroneous:

FOF # 2 ... Defendant suddenly raised his left hand in the air, tucked his *left arm* behind his back, as if to conceal something.

The reference to "left" arm was an obvious mistake in drafting. The officers both testified and the court found in its oral findings that Ugalino had tucked his *right* arm behind his back.

FOF # 3 For officer safety, all three men [were ordered] to raise there (sic) hands. The males including Defendant refused to raise there (sic) hands, *and Defendant backed away from the officers.*

Although there was no testimony at the suppression hearing that Ugalino backed away from the officers, Officer Wingad testified at trial that Ugalino "started to step back in the garage" after Officer Wingad told him to raise his hands. Trial testimony can be used to sustain the denial of a motion to suppress. *State v. Vinuya,* 96 Hawai'i 472, 481, 32 P.3d 116, 125 (App.2001). In addition, whether Ugalino backed away or not was not material to the circuit court's analysis.

FOF # 4 *After the individuals continued to refuse the police demands, Officer Dana Wingad drew his firearm and continued to instruct the individuals to raise there (sic) hands.*

## II. UGALINO'S CONVICTION ON COUNT 3

### A. The Trial Evidence

At trial, Officer Wingad [8] testified to the same basic events leading to Ugalino's arrest as he had at the suppression hearings. In particular, Officer Wingad testified that a pat-down search of Ugalino for weapons was necessary for officer safety. Ugalino was obviously trying to conceal something, and Officer Wingad wanted to make sure that Ugalino could not pull out a gun and shoot the officers while they were arresting Ugalino's girlfriend. Ugalino fought against the officers' attempts to pat him down. Due to Ugalino's demeanor and the strength he displayed despite his small stature, Officer Wingad suspected that Ugalino was on drugs. Ugalino eventually kicked Officer Wingad in the left shin, leading to Ugalino's arrest for assaulting a police officer.

Officer Wingad had received training in the identification of narcotics, drug paraphernalia, and clandestine crystal methamphetamine labs. Officer Wingad testified that he searched Ugalino incident to arrest and found a large ziplock bag containing 17 to 19 grams of crystal methamphetamine with some "extremely large crystal meth rocks" in Ugalino's right front pocket. From that same pocket, Officer Wingad recovered two small ziplock packets with residue; an additional eight small ziplock packets that were empty; a piece of paper formed with a sharp tip at one end; $1,551 in cash; and a butane lighter. He also seized a glass pipe from a table in Ugalino's garage. Officer Wingad testified that the paper with a sharp tip could be used as a device to transfer drugs from a large stash into smaller packets or a pipe; that the butane lighter was the lighter of choice for methamphetamine users; and that the glass pipe was used to smoke methamphetamine.

Officer Wingad stated that he saw a number of items in the area of Ugalino's garage that could be used in a clandestine methamphetamine laboratory. These included buckets of acetone, which is a chemical used to manufacture methamphetamine; two cans of carburetor cleaner which also contained acetone; [9] two butane tanks which could provide a heat source to "cook" methamphetamine; a ventilation system; and glass beakers and jars. Officer Wingad, however, conceded that the items he claimed could be associated with a clandestine lab had not been recovered as evidence and the items he identified as containing acetone had not been analyzed.

An MPD criminalist testified that through laboratory analysis she determined that there were 17.44 grams (net weight) of a substance containing methamphetamine in the large ziplock bag recovered from Ugalino. The amount of residue in the two small ziplock packets was too small to analyze.

The State also called MPD Sergeant William Gannon who described his training, experience, and knowledge regarding how methamphetamine is packaged and distributed. Officer Gannon was shown the eight small ziplock packets recovered from Ugalino. Sergeant Gannon testified that in his experience, methamphetamine is always distributed in ziplock packets. He stated that each of the ziplock packets recovered from Ugalino would commonly be used to hold between .10 to .20 grams of methamphetamine, but that each packet could hold up to .5 grams of methamphetamine.

### B. There Was Insufficient Evidence to Convict Ugalino of Attempting to Distribute at Least One–Eighth Ounce of Methamphetamine.

Ugalino was convicted of both 1) possessing at least one-eighth ounce of methamphetamine in violation of HRS § 712–1242(1)(b)(i) (1993) [10] (Count 1) and 2) attempting to dis-

---

8. By the time he testified at trial, Dana Wingad had left the Maui Police Department and was a Staff Sergeant with the United States Army. For convenience sake, we will continue to refer to him as "Officer Wingad."

9. Officer Dana Wingad testified that the cans of carburetor cleaner could also be used to clean

carburetors. In addition, photographs admitted at trial appear to show equipment in Ugalino's garage that could be used to work on cars.

10. Hawai'i Revised Statutes (HRS) § 712–1242(1)(b)(i) (1993) provides in relevant part:
 § 712–1242 **Promoting a dangerous drug in the second degree.** (1) A person commits the

tribute at least one-eighth ounce of methamphetamine in violation of HRS §§ 705–500 and 712–1241(1)(b)(ii)(A) (1993) [11] (Count 3). Both convictions were based on the 17.44 grams of methamphetamine recovered from Ugalino's pocket. On appeal, Ugalino argues that his conviction on Count 3 should be vacated or reversed on a number of grounds. Because we conclude that Ugalino's claim that there was insufficient evidence to support the conviction on Count 3 is dispositive, we do not address his other claims.[12]

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. *State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981).

The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citations and certain quotation marks omitted).

In order to prove the attempted distribution of methamphetamine charged in Count 3, the State was required to show that Ugalino engaged in conduct constituting "a substantial step in the course of conduct intended to culminate" in the distribution of *at least one-eighth ounce* of methamphetamine. HRS §§ 705–500 and 712–1241(1)(b)(ii)(A). "Conduct shall not be considered a substantial step ... unless it is strongly corroborative of the defendant's criminal intent." HRS § 705–500(3). We conclude that there was insufficient evidence that Ugalino took a substantial step toward the distribution of at least one-eighth ounce (3.54 grams) of the 17.44 grams of methamphetamine in his possession. We therefore reverse his conviction on Count 3.

There was no evidence that Ugalino had engaged in negotiations, offered, or agreed to distribute any of the 17.44 grams of methamphetamine found in his possession. Indeed, there was no direct evidence of what Ugalino intended to do with the 17.44 grams. The State, however, argues that Ugalino's attempt to distribute at least one-eighth ounce could reasonably be inferred from the 17.44 grams of methamphetamine and eight empty ziplock packets Ugalino possessed and the other trial evidence. Based on the particular evidence adduced at Ugalino's trial, we disagree.

To establish the charged attempted distribution, the State was required to prove that Ugalino intended to distribute at least one-eighth ounce of the 17.44 grams. The evidence showed that Ugalino was a methamphetamine user. Officer Wingad testified

offense of promoting a dangerous drug in the second degree if the person knowingly:

...

> (b) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
> (i) One-eighth ounce or more, containing methamphetamine....

**11.** Hawai'i Revised Statutes (HRS) §§ 705–500 and 712–1241(1)(b)(ii)(A) (1993) provide in relevant part:

> **§ 705–500 Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
> ...
> (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
> ...

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

> **§ 712–1241 Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
> ...
> (b) Distributes:
> ...
> (ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:
> (A) One-eighth ounce or more, containing methamphetamine....

**12.** Because we reverse Count 3, we also do not address whether Ugalino's convictions on Counts 1 and 3 should have merged since they were both based on the same 17.44 grams of methamphetamine found in Ugalino's possession.

that the butane lighter recovered from Ugalino's pocket was the "lighter of choice" for methamphetamine users and the glass pipe found in Ugalino's garage was a device used to smoke methamphetamine. Officer Wingad also testified that he strongly suspected Ugalino was on drugs because of Ugalino's aggressive demeanor and the "overwhelming" strength Ugalino displayed despite his small size. During his closing argument, the Deputy Prosecuting Attorney conceded that Ugalino was "probably" a drug user.

The State introduced circumstantial evidence that Ugalino may also have been a methamphetamine dealer. It failed, however, to introduce evidence providing the jury with a rational basis for evaluating how much of the 17.44 grams Ugalino would distribute versus how much he would keep for personal use. The State did not introduce evidence of how much methamphetamine Ugalino had sold or consumed in the past. Nor was there any expert testimony about the amount of methamphetamine a typical user would consume, the quantity of methamphetamine a typical user would hold for consumption, or the street value of methamphetamine.[13] The only evidence on the portion of the 17.44 grams Ugalino intended to distribute was Sergeant Gannon's expert testimony that each of the eight empty ziplock packets found in Ugalino's pocket would commonly be used to hold between .1 and .2 grams of methamphetamine, but could hold up to .5 grams of methamphetamine. At best, Sergeant Gannon's testimony permitted the jury reasonably to infer that Ugalino intended to distribute a total of between .8 and 1.6 grams of the 17 .44 grams of methamphetamine. This is less than the one-eighth ounce threshold necessary to prove Ugalino's attempted distribution charge.

## III. CONCLUSION

We affirm the November 20, 2002 Judgment of the Circuit Court of the Second

Circuit as to Counts 1, 2, 4, and 5. We reverse the Judgment as to Count 3.

**13.** We note that the trial judge precluded the State from introducing evidence of the street value of methamphetamine as irrelevant and expressed doubt over whether the State's expert had sufficient background and training to opine on how much methamphetamine a person could use. In our view, in a case like Ugalino's, the testimony of a properly qualified expert regarding the street value of drugs and the consumption practices of drug users is relevant. The street value of methamphetamine could have assisted the jury in assessing how much methamphetamine Ugalino would have to sell to accumulate the $1,551 in his pocket. The consumption practices of typical methamphetamine users would have assisted the jury in assessing whether the 17.44 grams Ugalino possessed was too much for him to consume.